311 Ga. 843
FINAL COPY

S21A0246.  MONTANEZ v. THE STATE.

BETHEL, Justice.

A Fulton County jury found Martin Montanez guilty of the murders of Byron Caceres and Eulalio Mederos-Vega and several theft, firearm-possession, and drug-related offenses arising from the incident in which they were killed. On appeal, Montanez argues that the evidence presented at trial was insufficient as a matter of due process to sustain his conviction as to one count of possession of a firearm by a convicted felon under OCGA § 16-11-133 (b); that the evidence was insufficient to sustain any of his convictions because the testimony of his alleged accomplice was not corroborated, as required by Georgia law; and that his trial counsel provided constitutionally ineffective assistance. We affirm.[1]

---

[1] The crimes occurred on September 14, 2014. On December 19, 2014, a Fulton County grand jury returned a 21-count indictment charging Montanez with the malice murders of Caceres and Mederos-Vega (Counts 1 and 2), ten

1. Viewed in the light most favorable to the verdicts, the evidence presented at trial showed the following. In the early afternoon of September 14, 2014, Caceres drove to Diego Molina's apartment so that the two could smoke marijuana and go to the

counts of felony murder (Counts 3 through 12), the armed robbery of Caceres and Mederos-Vega (Counts 13 and 14), the aggravated assault of Caceres and Mederos-Vega (Counts 15 and 16), conspiracy to possess methamphetamine (Count 17), burglary (Count 18), possession of a firearm during the commission of a felony (Count 19), possession of a firearm by a convicted felon (Count 20) and possession of a firearm by a convicted felon through use of a firearm (Count 21). A co-defendant, Zusi Aguirre, was also charged as to Counts 1 through 10 and 13 through 19. Before trial, the State dismissed the burglary count and the two counts of felony murder predicated on burglary (Counts 9, 10, and 18) as to Montanez. Aguirre pled guilty to aggravated assault, burglary, possession of a firearm during the commission of a felony, and conspiracy to possess methamphetamine and was sentenced to 15 years in prison and 20 years on probation. Her case is not part of this appeal.

At a jury trial held from September 19 to 22, 2016, Montanez was found guilty on Counts 1 through 8, 11 through 13, 15 through 17, and 19 through 21 and not guilty on Count 14. On September 23, 2016, the trial court sentenced Montanez to life in prison without parole on both Counts 1 and 2, to be served concurrently, a term of three years in prison on Count 17 to be served concurrently with Counts 1 and 2, a term of five years in prison on Count 19 to be served consecutively to Counts 1 and 2, and a term of 15 years in prison on Count 21 to be served consecutively to Count 19. The remaining counts were either vacated by operation of law or merged. The State has not challenged Montanez's sentences. See *Dixon v. State*, 302 Ga. 691, 697-698 (808 SE2d 696) (2017). On January 7, 2019, the trial court amended its sentencing order to merge both Counts 19 and 20 with Count 21.

Montanez filed a motion for new trial on October 6, 2016, which he amended on April 23, 2018. Following hearings on June 11 and June 19, 2018, the trial court denied the motion, as amended, on December 26, 2018. Montanez filed a notice of appeal on January 16, 2019, which he amended on August 28, 2020. Montanez's case was docketed to this Court's term commencing in December 2020 and submitted for a decision on the briefs.

2

mall. Molina knew that Caceres was in the business of selling methamphetamine, and after picking up Molina, Caceres received a call instructing him to come to an apartment in Chamblee. After driving to the apartment and going inside, Caceres returned to his car carrying a "heavy" black bag with two paper towels on top. Molina testified that Caceres did not tell him what was going on but that he "already had an idea." After a phone call in which Caceres received directions from "his boss or something," Caceres and Molina drove to Mederos-Vega's apartment complex in Sandy Springs. They arrived around 5:00 p.m., and Caceres went up to Mederos-Vega's apartment with the black bag. Molina stayed in the car.

Mederos-Vega, Montanez, and his girlfriend, Zusi Aguirre, were inside the apartment. Aguirre testified to the following. She drove Montanez to the apartment after Montanez received a phone call instructing him to go there. Montanez was carrying "his" gun at the time. Caceres came into the apartment carrying a black bag. He then removed six plastic containers from the bag, each of which were

full of methamphetamine. As Montanez, Mederos-Vega, and Caceres were discussing a deal for the drugs, Montanez handed Aguirre a key and instructed her to go to his car to retrieve money from an envelope under his seat. She was confused by this request because she had the keys to the car, which was unlocked, and she did not think that he had any money in the car.

According to Aguirre, before walking into the apartment, Montanez instructed her to ask the men they were to meet whether the methamphetamine "was 36." Aguirre testified that she did not understand what Montanez was asking her to do, that she never really became part of the conversation inside the apartment between Montanez, Mederos-Vega, and Caceres, and that she never asked any questions about the methamphetamine.

Aguirre went to the car and searched for the money Montanez described, but found nothing. She then saw Montanez walking toward her carrying the bag that Caceres had brought into the apartment. The bag had paper towels sticking out of the top. Montanez seemed "hurried," and he instructed her to get in the car

4

and drive away. She then drove Montanez away from the apartment, drove onto Interstate 285, and then began driving north, eventually stopping near Helen. During their drive, she heard Montanez tell someone over a phone call that "it's done." Montanez then broke one of his cell phones and threw it out of the car window.[2]

After Caceres had been inside the apartment for about an hour, Molina became concerned because he knew Caceres was "working." He then heard something that sounded like gunshots or fireworks coming from the apartment building. Molina answered several calls placed to Caceres's phone, which Caceres had left in the car with Molina. The caller was Caceres's business associate, and he told Molina that he should leave.[3] Molina then drove away in Caceres's car and went to the apartments where Caceres's brother and

---

[2] Aguirre testified that Montanez had "multiple" cell phones and that he changed phones all the time.

[3] The police never identified the individual (or individuals) Caceres and Molina spoke to on the phone. There was no subscriber information listed for the phone that called Caceres's phone around the time of the shootings, and the police determined that it was likely a "burner" phone because service for the phone was only activated for one day and then terminated. The lead detective in the case testified that it is common for people engaged in criminal activity to use "burner" phones.

girlfriend lived. Molina appeared to be nervous and scared, and he told Caceres's brother and girlfriend that Caceres had gone into Mederos-Vega's apartment but never came out.

Around 6:30 p.m., the police responded to a 911 call from Mederos-Vega's wife reporting a shooting at their apartment. When the police arrived, they found Mederos-Vega and Caceres lying on the floor, having both suffered multiple gunshot wounds. Both were dead. The medical examiner later concluded that Mederos-Vega and Caceres both died from the gunshot wounds and that the manner of their deaths was homicide.[4]

Aguirre testified that she and Montanez stayed in Helen only a short time and that she drove them back to her home in Mableton that night. When they arrived, both Aguirre and Montanez unpacked the methamphetamine from the bag. Montanez put most of it into a suitcase but gave some to Aguirre. The two then had an argument, and Aguirre demanded that Montanez leave. He did so but later returned to their home and asked Aguirre to drive him

_____

[4] No methamphetamine was found in the apartment.

6

across the Veterans Memorial Bridge, which spans the Chattahoochee River. As they drove over the bridge, Montanez asked Aguirre to stop the car. Montanez then disassembled his silver 9mm handgun and threw the pieces into the river. Montanez later sent a text message to Aguirre warning her not to "f**k with the suitcase."[5]

A few days later, Aguirre spoke with a friend who asked her if she had been involved in a double homicide that had been reported in the local news. Aguirre recognized the apartment shown in the news story and became emotional. She decided to leave the Atlanta area and drive to see her father in Pensacola, Florida.

The next day, the police arrested Aguirre in Alabama after

---

[5] This text message was sent from a number listed in Aguirre's phone under the name "Jr Guzman." That listing contained a picture of Montanez. Aguirre testified that this was a nickname she had given Montanez and that the number was for one of the phones Montanez used. Aguirre's phone also had a listing for "Martin Montanez" with a different phone number. Records showed that, on September 17, after the murders, Aguirre sent a text message to the number for "Jr Guzman" that began "Martin thank you so much . . ." and appearing to address "Martin" as the recipient. In later messages, the recipient responded to Aguirre, thus appearing to accept the name "Martin." The police were unable to locate subscriber information for the number associated with "Jr Guzman" in Aguirre's phone.

stopping her for speeding and discovering that she had two handguns and methamphetamine in the car. She told the police that she had been speeding because she felt threatened because she knew about "a murder in Atlanta." Aguirre told the police that she and Montanez had been in a romantic relationship and that she regularly saw Montanez carry a silver semiautomatic 9mm handgun. The State introduced photographs taken with Aguirre's phone of Montanez on the day before the shootings showing him holding a silver handgun.[6]

On September 24, based on information from Aguirre, a police dive team found the slide and lower grip of a silver Taurus semiautomatic 9mm handgun in the Chattahoochee River near the Veterans Memorial Bridge. A member of the dive team testified that based on the lack of corrosion and algae on the slide and grip, he

---

[6] The lead detective in the case characterized the gun Montanez could be seen holding in the photographs as "uncommon," noting that the slide was shaped in a way that exposed the barrel. The detective said this design was "more unique and noticeable" than other common types of handguns. The detective stated that the upper piece of the firearm recovered from the river had a similar shape and design. The firearms examiner also noted several design consistencies between the gun Montanez can be seen holding in the photographs and a Taurus 9mm pistol, including the "open slide" design.

estimated that those pieces had been in the water for only a few days. Two weeks later, a second dive team searched the same location and found a lower receiver from a silver Taurus 9mm handgun. It matched the slide recovered in the earlier search. The police recovered eight 9mm shell casings and a number of 9mm bullets and bullet fragments from the crime scene and Caceres's body. The State presented evidence that the shell casings had been fired from the gun recovered from the river and that all of the bullets recovered from the crime scene had been fired from the same firearm, which was consistent with a Taurus 9mm handgun.[7]

In November 2015, the police responded to a 911 call reporting a domestic disturbance involving Montanez, who had not yet been apprehended. Montanez fled from the scene but was apprehended based on a tip from the woman who placed the call. When Montanez

---

[7] The firearms examiner testified that she could determine that the cartridges recovered from the crime scene had been fired from the gun to which the slide was attached due to microscopic markings on the cartridges that were caused by contact with the slide. The firearms examiner was not able to determine whether the gun to which the slide had been attached fired the bullets that were recovered because no barrel had been recovered. However, microscopic examination of the bullets revealed that they had all been fired by the same gun, which was consistent with a Taurus 9mm pistol.

was found, his hair and beard were longer than they had been in 2014, and he provided an alias to law enforcement. He was driving a vehicle with a Kansas license plate. The State introduced evidence that Montanez had previously been convicted of theft by receiving a stolen firearm, a felony.

(a) Montanez argues that the evidence presented at trial was insufficient as a matter of constitutional due process to support his conviction for possession of a firearm by a convicted felon in violation of OCGA § 16-11-133 (b). We disagree.

When evaluating the sufficiency of evidence, this Court views the evidence presented at trial in the light most favorable to the verdicts and asks whether any rational trier of fact could have found the defendant guilty beyond a reasonable doubt. See *Jackson v. Virginia*, 443 U. S. 307, 319 (III) (B) (99 SCt 2781, 61 LE2d 560) (1979). To prove a violation of OCGA § 16-11-133 (b), the State must present evidence that the defendant possessed a firearm in the commission of certain felonies after previously having been convicted of one of nine enumerated felonies or "any felony involving

10

the use or possession of a firearm." OCGA § 16-11-133 (b).[8] Count 21 of the indictment alleged that Montanez was in possession of a firearm, "having been previously convicted of a felony involving the possession or use of a firearm[.]"

At trial, the State introduced its Exhibit 69, which was a copy of a sentencing order showing that Montanez had previously pled guilty to theft by receiving stolen property (a firearm), a felony, in

---

[8] OCGA § 16-11-133 (b) provides:

Any person who has previously been convicted of or who has previously entered a guilty plea to the offense of murder, murder in the second degree, armed robbery, home invasion in any degree, kidnapping, rape, aggravated child molestation, aggravated sodomy, aggravated sexual battery, or any felony involving the use or possession of a firearm and who shall have on or within arm's reach of his or her person a firearm during the commission of, or the attempt to commit:
(1) Any crime against or involving the person of another;
(2) The unlawful entry into a building or vehicle;
(3) A theft from a building or theft of a vehicle;
(4) Any crime involving the possession, manufacture, delivery, distribution, dispensing, administering, selling, or possession with intent to distribute any controlled substance as provided in Code Section 16-13-30; or
(5) Any crime involving the trafficking of cocaine, marijuana, or illegal drugs as provided in Code Section 16-13-31,
and which crime is a felony, commits a felony and, upon conviction thereof, shall be punished by confinement for a period of 15 years, such sentence to run consecutively to any other sentence which the person has received.

11

September 2013.[9] The State therefore presented evidence that Montanez had previously been convicted of a felony involving the use or possession of a firearm. Compare *Brooks v. State*, 309 Ga. 630, 631-633 (1) (a) (847 SE2d 555) (2020) (holding that evidence was insufficient where evidence of the prior offense did not suggest that the offense had been committed with the use or possession of a firearm and the offense could be committed without the use or possession of a firearm). The State also presented evidence that Montanez then possessed a firearm during the commission of several crimes, including the murders of Caceres and Mederos-Vega. Accordingly, the evidence presented at trial was sufficient to sustain Montanez's conviction for violating OCGA § 16-11-133 (b).[10]

(b) Montanez also argues that the evidence presented against

---

[9] Although this exhibit in the original trial record transmitted to this Court was incomplete, the exhibit was supplemented and reflects Montanez's prior indictments and sentencing in full.

[10] Montanez does not argue that the evidence presented at trial was insufficient as a matter of constitutional due process to sustain his other convictions. Thus, we limit our review under *Jackson v. Virginia* to the evidence presented as to Count 21. See *Davenport v. State*, 309 Ga. 385, 391-392 (4) (846 SE2d 83) (2020) (for non-death-penalty cases docketed to the December 2020 term and thereafter, the Court will no longer routinely review the sufficiency of the evidence presented at trial sua sponte).

him was insufficient under Georgia law as to all of his convictions because Aguirre's testimony was not sufficiently corroborated, as required by OCGA § 24-14-8. We disagree.

Under Georgia law, "[t]he testimony of a single witness is generally sufficient to establish a fact. . . ." OCGA § 24-14-8. However, in felony cases where the only witness is an accomplice to the crimes, that witness's testimony alone is insufficient to support a defendant's convictions. See id. When "evidence presented at trial could support a finding that a witness acted as an accomplice, it is for the jury to determine whether the witness acted in such a capacity." *Doyle v. State*, 307 Ga. 609, 612 (2) (a) (837 SE2d 833) (2020). However, the evidence may also authorize a properly instructed jury to find that a witness was not an accomplice, and in that case, the testimony of that witness is sufficient to convict the defendant. See *State v. Grier*, 309 Ga. 452, 456 (2) (847 SE2d 313) (2020).

> Although OCGA § 24-14-8 provides that corroboration is required to support a guilty verdict in felony cases where the only witness is an accomplice, only slight evidence of

13

corroboration is required. The necessary corroboration may consist entirely of circumstantial evidence, and evidence of the defendant's conduct before and after the crime was committed may give rise to an inference that he participated in the crime. The evidence need not be sufficient in and of itself to warrant a conviction, so long as it is independent of the accomplice's testimony and directly connects the defendant to the crime or leads to the inference of guilt. The sufficiency of the corroboration is a matter for the jury to decide.

(Citations and punctuation omitted.) *Raines v. State*, 304 Ga. 582, 588 (2) (820 SE2d 679) (2018).

[T]he independent evidence must corroborate both the identity of the defendant and the fact of his participation in the crime. In other words, corroboration of only the chronology and details of the crimes is not sufficient, and there must be some independent evidence tending to show that the defendant himself was a participant in the crimes.

(Citation and punctuation omitted.) *Pittman v. State*, 300 Ga. 894, 896 (1) (799 SE2d 215) (2017) (setting forth corroboration requirement under former OCGA § 24-4-8); see also *Ramirez v. State*, 294 Ga. 440, 442 n.5 (754 SE2d 325) (2014) (noting that the provisions of former OCGA § 24-4-8 were carried forward into the

14

current Evidence Code as OCGA § 24-14-8).[11]

Here, the jury was properly instructed on the requirement for corroboration of an accomplice's testimony, and there was some evidence, including Aguirre's own testimony and her guilty plea to a number of offenses with which she had been jointly charged with Montanez, from which the jury could have determined that Aguirre was an accomplice to each of the crimes of which Montanez was convicted. Likewise, there was evidence from which the jury might have found Aguirre not to be an accomplice for one or more of the offenses. However, even assuming the jury found that Aguirre was Montanez's accomplice with respect to all counts, there was at least slight evidence that corroborated her testimony about Montanez's participation in the crimes.

---

[11] Because courts generally defer to the jury's assessment of the evidence against a defendant, appellate litigation regarding the requirements of OCGA § 24-14-8 often revolves around whether the jury was properly instructed regarding the accomplice-corroboration requirement. In the absence of an instruction indicating to the jurors that there must be corroborating evidence before they can consider the testimony of a witness they find to be an accomplice, this Court has sometimes identified reversible error where there was evidence that a witness was an accomplice to the crime and that witness provided testimony directly linking the defendant to the crime. See, e.g., *Doyle*, 307 Ga. at 613 (2).

The State presented evidence that Caceres and Mederos-Vega were shot several times with 9mm bullets and that those bullets were fired from the same 9mm firearm. The State also presented evidence that 9mm shell casings recovered from the scene of the shootings had all been fired from a silver Taurus 9mm semiautomatic pistol, three pieces of which were recovered from the Chattahoochee River a few days after the shootings near where Aguirre testified Montanez had thrown pieces of his gun after the shootings. The bullets, shell casings, and pieces of the gun were all entered into evidence, and the State presented extensive testimony from law enforcement officials about those items.

The State also entered into evidence several photographs taken the day before the shootings showing Montanez and Aguirre together, with Montanez holding a silver handgun. The State presented testimony from the firearms examiner and the lead detective in the case that the gun Montanez could be seen holding had numerous design similarities to the pieces of the Taurus 9mm handgun recovered in the river.

From this evidence, the jury was authorized to determine that, on the day before the shootings, Montanez was in possession of the weapon used to kill Caceres and Mederos-Vega. Standing alone, such circumstantial evidence was likely insufficient to warrant Montanez's convictions under *Jackson v. Virginia.* However, that evidence, independent of Aguirre's testimony, authorized the jury to determine that Montanez was in possession of the murder weapon on the day before the murders and provided at least slight corroboration of Aguirre's testimony connecting Montanez to the firearm used in the shootings. See *Raines*, 304 Ga. at 588 (2) (noting that the corroborating evidence need not be sufficient on its own to warrant a conviction); see also *Lanier v. State*, 310 Ga. 520, 523 (2) (a) (852 SE2d 509) (2020) (finding slight corroboration of accomplice's testimony where the police connected firearms to the defendant based on fired shell casings found at the crime scene); *Baines v. State*, 276 Ga. 117, 119 (1) (575 SE2d 495) (2003) (determining that, among other independent evidence, evidence that the murder weapon was found in the location described by the

17

accomplice corroborated the accomplice's testimony).

There was also at least slight corroboration of Aguirre's account in regard to the alleged conspiracy to possess methamphetamine. Molina and Caceres were friends, and Molina knew Caceres was involved in selling methamphetamine. On the day of the crimes, Molina was with Caceres when Caceres received a call from a person Molina believed to be his "boss," directing him to make a pickup in Chamblee. After driving to an apartment in Chamblee, Caceres went inside and came back to his car a few minutes later with a "heavy" black bag with paper towels on top. Caceres placed the bag in his car, and he and Molina drove to an apartment complex in Sandy Springs. Caceres took the bag and went into the apartment. Although Molina never testified that he saw methamphetamine in the bag, he testified that he knew Caceres was "working" and became concerned when he did not return from the apartment. He later answered a call to Caceres's phone from someone he knew to be a business associate of Caceres instructing him to leave the area. No subscriber information was ever found for

the phone that placed the call, and the police determined that it likely came from a "burner" phone. Testimony also established that "burner" phones are commonly used in criminal activity.

Moreover, after the incident, Aguirre received a text message she testified came from Montanez instructing her not to "f\*\*k with the suitcase," which she said contained some of the methamphetamine Montanez took from Caceres and Mederos-Vega in the apartment. The text message came from a number listed in Aguirre's phone as "Jr Guzman," but Aguirre testified that it was actually a number for Montanez. No subscriber information was ever located for the phone associated with "Jr Guzman," but on at least one occasion after the incident, Aguirre sent a text message to that number in which she appeared to address the recipient as "Martin." The recipient responded to that message, thus appearing to accept the name "Martin." Those text messages provided slight corroboration of Aguirre's testimony that Montanez was the recipient. The jury was thus authorized to find at least slight corroboration of Aguirre's testimony that she communicated with

Montanez about methamphetamine after the incident. See *Nicholson v. State*, 307 Ga. 466, 471 (2) (837 SE2d 362) (2019) (text communications between the defendant and his accomplice after the crimes corroborated the accomplice's testimony); see also *Edwards v. State*, 299 Ga. 20, 23 (1) (785 SE2d 869) (2016) (finding at least slight corroboration of accomplice's testimony where defendant referenced stolen property during a recorded phone call between defendant and his accomplice after the crimes); *Crawford v. State*, 294 Ga. 898, 901-902 (1) (757 SE2d 102) (2014) (determining that accomplice's testimony was sufficiently corroborated where cell phone records showed that defendant's cell phone had communicated with accomplice's cell phone around the time of the crimes even though the records did not reveal the contents of the conversations or establish that the defendant participated in the calls). Thus, in conjunction with Molina's testimony about Caceres's involvement in the methamphetamine business and events leading up to the incident in Mederos-Vega's apartment, including his description of the black bag with the paper towels sticking out of the

20

top that Caceres was carrying, the jury heard at least slight corroboration of Aguirre's testimony regarding the alleged methamphetamine conspiracy and Montanez's participation in it.

Accordingly, evidence independent of Aguirre's testimony provided the slight corroboration of Aguirre's account of Montanez's identity and participation in the crimes necessary to sustain his convictions under OCGA § 24-14-8. See *Nicholson*, 307 Ga. at 471 (2); *Lanier*, 310 Ga. at 523 (2) (a); *Edwards*, 299 Ga. at 23 (1); *Baines*, 276 Ga. at 119 (1). Compare *Taylor v. State*, 297 Ga. 132, 135 (2) (772 SE2d 630) (2015) (reversing murder conviction where accomplice's testimony regarding defendant's participation in the crimes was corroborated only by testimony that defendant was seen with other accomplices on the evening after the murder); *Gilmore v. State*, 315 Ga. App. 85, 87-92 (1) (726 SE2d 584) (2012) (reversing conviction where the only evidence against the defendant other than the testimony of the accomplice showed that the defendant had been with the accomplice the night the crimes were committed and that the defendant had a prior encounter with one of the victims). This

21

enumeration of error therefore fails.

2. Montanez also argues that his trial counsel provided constitutionally ineffective assistance by not cross-examining Aguirre as to whether she would be eligible for parole as part of her plea bargain. To prevail on this claim, Montanez

> has the burden of proving both that the performance of his lawyer was professionally deficient and that he was prejudiced as a result. To prove deficient performance, [Montanez] must show that his trial counsel acted or failed to act in an objectively unreasonable way, considering all of the circumstances and in light of prevailing professional norms. To prove resulting prejudice, [Montanez] must show a reasonable probability that, but for counsel's deficiency, the result of the trial would have been different. In examining an ineffectiveness claim, a court need not address both components of the inquiry if the defendant makes an insufficient showing on one.

(Citations and punctuation omitted.) *Stuckey v. State*, 301 Ga. 767, 771 (2) (804 SE2d 76) (2017) (citing *Strickland v. Washington*, 466 U. S. 668, 687 (III) (104 SCt 2052, 80 LE2d 674) (1984)). "A strong presumption exists that counsel's conduct falls within the broad range of professional conduct." (Citation and punctuation omitted.) *Ford v. State*, 298 Ga. 560, 566 (8) (783 SE2d 906) (2016).

The jury was first made aware that Aguirre had accepted a plea bargain and would be testifying for the State in the prosecutor's opening statement. On direct examination, Aguirre then testified that she had initially been charged with Montanez for the murders but pled guilty to aggravated assault, burglary, possession of a weapon during the commission of a felony, and conspiracy to possess methamphetamine, for which she had been sentenced to serve 15 years in prison and 20 years on probation. Aguirre testified that she agreed to testify in Montanez's trial as part of her plea agreement. The prosecutor then referred to Aguirre's plea and sentence in his closing statement.

In both his opening statement and closing argument, Montanez's lead trial counsel discussed the nature of the charges that Aguirre had pled guilty to as well as the sentences she was to receive. In his opening statement, Montanez's lead counsel specifically noted that Aguirre had been indicted for the murders of Caceres and Mederos-Vega, that she initially faced two life sentences on those charges, and that she ultimately accepted a deal

23

in which she would serve only 15 years in prison, noting that Aguirre received "a great deal, a huge deal." Counsel also extensively cross-examined Aguirre as to the details of her trial testimony, how it varied from statements she initially gave to the police, the fact that she was under the influence of methamphetamine during the incident, and the terms of her plea agreement with the State. Counsel also explored inconsistencies in Aguirre's statements during his cross-examination of the lead detective in the case. Finally, in his closing argument, counsel referred to inconsistencies in Aguirre's testimony and argued that Aguirre had agreed to testify "to avoid a harsher sentence." Counsel went on to note, "That's her motivation. That's why her story is so nice and clean[.]"

At the hearing on Montanez's motion for new trial, his lead counsel, who had practiced criminal law for 18 years, testified that in his experience, he had never seen a defense attorney bring up parole guidelines when impeaching a prosecution witness. Counsel testified that he did not feel the need to go further into the sentence Aguirre received because the jury already knew that information.

Montanez has not carried his burden of establishing that his trial counsel performed deficiently by not inquiring about the possibility that Aguirre would be eligible for parole at some point during her sentence. Counsel clearly made efforts to attack Aguirre's credibility through his cross-examination of her and the lead detective as to the terms of her plea agreement, her motivation for testifying, and the inconsistencies between her trial testimony and various statements she made to the police after her arrest. As noted above, Montanez's counsel also used his opening statement and closing argument to attack Aguirre's credibility, highlighting those inconsistencies in her testimony and noting multiple times that her testimony was given in exchange for a significantly lesser sentence than she had initially faced.

Although counsel could likely have inquired further into the details of Aguirre's sentence and the possibility that she might be eligible for parole, see *Manley v. State*, 287 Ga. 338, 339-344 (2) (698 SE2d 301) (2010), counsel did not perform deficiently by not doing so. See *Daugherty v. State*, 291 Ga. App. 541, 544 (3) (a) (662 SE2d

25

318) (2008) (no deficient performance where trial counsel elicited testimony about witness's plea agreement and sentence but did not impeach witness with his eligibility for parole and probation). As we have explained,

> [d]ecisions about what questions to ask on cross-examination are quintessential trial strategy and will rarely constitute ineffective assistance of counsel. In particular, whether to impeach prosecution witnesses and how to do so are tactical decisions.

(Citation omitted.) *Edwards v. State*, 299 Ga. 20, 24 (2) (785 SE2d 869) (2016). Moreover,

> [a]lthough an attorney is permitted to thoroughly question a testifying co-defendant regarding the details of any plea agreement, it does not necessarily follow that counsel is ineffective for failing to elicit all details of the agreement. As trial counsel obtained testimony from [Aguirre] that [she] had substantial motivation to testify against [Montanez], we cannot say that [counsel's] failure to ask about specific effects of the plea deal was patently unreasonable.

(Citations and punctuation omitted.) Id. at 24-25 (2); see also *Romer v. State*, 293 Ga. 339, 344 (3) (745 SE2d 637) (2013) (strategic and tactical decisions, like those about the extent of cross-examination, "will not form the basis for an ineffective assistance of counsel claim

unless it was so patently unreasonable that no competent attorney would have chosen it" (citation and punctuation omitted)). Because Montanez has failed to show that his trial counsel's performance was deficient, this claim of ineffective assistance fails.

*Judgment affirmed. All the Justices concur.*

Decided June 21, 2021.

Murder. Fulton Superior Court. Before Judge McBurney.

*Steven E. Phillips*, for appellant.

*Paul L. Howard, Jr., District Attorney, Lyndsey H. Rudder, Kevin C. Armstrong, Assistant District Attorneys; Christopher M. Carr, Attorney General, Paula K. Smith, Senior Assistant Attorney General*, for appellee.