314 Ga. 751
FINAL COPY

S22A0764. JACKSON v. THE STATE.

McMILLIAN, Justice.

Following a jury trial in September 2018, Curtis Jackson was convicted of malice murder in connection with the shooting death of Vernard Mays.[1] On appeal, Jackson asserts that the trial court erred (1) in failing to instruct the jury that it must find corroboration for an accomplice's testimony and (2) in failing to excuse Juror Number

---

[1] Mays was killed on October 27, 2015. On April 12, 2016, a Bibb County grand jury jointly indicted Jackson; Jadarien Flowers; Michael Hardy, Jr.; Drayson McDonald; and Addonis Rhodes for malice murder (Count 1), felony murder predicated on aggravated assault with a deadly weapon (Count 2), violation of the Georgia Street Gang Terrorism and Prevention Act ("Gang Act") (Count 3), and felony murder predicated on violation of the Gang Act (Count 4). Prior to trial, Flowers, Hardy, and McDonald entered negotiated guilty pleas to aggravated assault as a lesser-included offense of Count 2, with the remaining counts to be nolle prossed following their truthful testimony against Jackson and Rhodes; Hardy also entered a guilty plea to Count 3. At a joint jury trial held from September 11 to 18, 2018, a jury found Jackson and Rhodes guilty of all four counts. The trial court sentenced Jackson to serve life in prison without the possibility of parole for malice murder; the remaining counts were either merged for sentencing purposes or vacated by operation of law. Rhodes's conviction is not at issue in this appeal. Jackson timely filed a motion for new trial, which he amended through new counsel on November 19, 2019. Following a hearing, the trial court denied the motion for new trial on January 28, 2022. Jackson timely appealed. The case was docketed to the April 2022 term of this Court and submitted for a decision on the briefs.

22 for cause. Because we conclude that the trial court did not commit any reversible error, we affirm.

The evidence produced at trial showed that on the afternoon of October 27, 2015, a car accident occurred near Second and Ell Street in Macon, outside the house where Mays lived with his mother, Contessa Jones. Mays, who did not know any of the people involved, helped render aid until EMTs arrived. Devonte Hollingshed, one of the passengers injured in the accident, was a member of the "Crips" street gang and had a gun with him in the car at the time of the accident. While Hollingshed was transported to the hospital by ambulance, another passenger, Tymario Williams, hid the gun in the bushes outside Jones's home because he was not sure whether the gun was stolen. Marquis Simmons, Williams's cousin, heard about the accident and went to the scene to retrieve the gun. Simmons later told police officers where the gun was stored in his bedroom.

Not knowing that Simmons had already retrieved the gun, Jackson, also a Crips member, went to Jones's house to locate the

gun along with Flowers (a fellow Crips member), Rhodes (a member of the "10-12" street gang), and McDonald (a 10-12 member). Two men nearby told Jackson that they had seen someone from Jones's house take the gun out of the bushes, so Jackson knocked on Jones's front door. Jackson became frustrated when someone inside Jones's house kept asking who was there but would not open the door.

The group then met up with Hardy, dropped Jackson's car off at a gym, and returned to Jones's house in Hardy's car. McDonald, Flowers, Rhodes, and Hardy each had a gun with them; Jackson did not. Jackson directed Hardy to park in an alley near Jones's house. According to Flowers, Jackson was "[s]till kind of frustrated" that he could not find the gun. When no one answered the front door, they went to the back door. Mays opened the back door, and Jackson asked him about the gun. Mays responded, "I don't know what you're talking about." Jackson then said, "[W]ell, if something happens you can't say I didn't say nothing." As soon as Mays began to say, "[W]ell," a gunshot rang out.

Flowers testified that Rhodes, who was carrying a .40-caliber

handgun, was the first to shoot, and then he, Hardy, and McDonald also fired shots as they ran away. Flowers saw that Mays had been shot before Mays went back inside the house. Everyone but Jackson returned to Hardy's car. As they drove away, Rhodes told them that he "unloaded his whole clip and he knew he hit [Mays]." The next day, Rhodes told Flowers that he shot Mays because Jackson "gave him a look."

Hardy testified that after their group confronted Mays about the gun, Mays went back inside and was closing the door when Jackson "looked at [Rhodes] some kind of way . . . like just like shoot." Jackson then ducked behind a truck, and Rhodes fired a shot. Rhodes then ran off, and McDonald and Flowers started shooting while they ran backward. At that point, Hardy started shooting as well. Everyone but Jackson, who was "nowhere to be found," ran back to Hardy's car and sped away. Hardy dropped the other three men off at a friend's house and then went to a park and threw his gun away. Jackson called him later that night, but he did not

4

answer.[2]

Mays's uncle, known as "J-Bone," testified that he was also a Crips member and that on the night of the shooting he received a message from Jackson around 8:30 p.m., stating, "Your people in the house on the south side got my guns, and I'm telling you because you're my homie. I knocked on the door and they were talking through the door." He did not know that Jackson was referring to Mays until he got a call from his sister that Mays had been shot.

Jones testified that around 7:00 p.m. that evening, a man knocked loudly on her door, demanding that she open the door. The man would not tell her who he was or what he wanted. Jones was home alone at the time and refused to open the door. She then heard the man talking to someone else in the yard, cursing and saying, "I'm not going to be talking to this lady through no door." She saw

---

[2] McDonald also testified pursuant to his plea agreement. According to McDonald, the conversation between Jackson and Mays seemed normal at first, but then there were multiple gunshots. McDonald ran back to the car, and Hardy, Rhodes, and Flowers followed. Everyone was "hyped up about shooting," and Hardy said, "I just let the whole clip run." He saw Rhodes fire first, followed by Hardy.

about five men outside, but only one on the porch. They eventually stopped knocking and left. When Mays arrived home later that evening, the knocking began again. The person knocking again refused to respond to their inquiries. After a time, the knocking stopped, and Jones went to her bedroom. While in her room, she heard Mays open the back door and a man say that he was coming to get something. Mays told the man, "We ain't got none of that." The man then said, "I know your uncle." Mays told him, "We don't have it." Then there was a pause and a gunshot. Mays ran into Jones's bedroom and said, "They shot me, Mama." When she looked out the back door, it looked like someone was coming up the steps, so she locked her bedroom door, and she and Mays hid beside her bed while she called 911. She heard several more gunshots as they hid. She also heard the sound of crunching glass and someone say, "We got to finish him off." Mays died in her arms before law enforcement officers arrived. In the days after Mays's death, Jones saw a Facebook post by Rhodes, wherein he referenced killing: "Now's it's like [Lucifer] the only person that understands my pain,

he understands that black hole in my soul . . . he understands why I kill, he understands why I rob."

Law enforcement officers observed multiple gunshot holes in and around Jones's house and recovered ten shell casings — three .40-caliber casings, six .380-caliber casings, and one 9mm casing — and five projectiles — four .40-caliber projectiles and one .380-caliber projectile. Lieutenant Cedric Penson testified as an expert in gang crimes and explained that a higher ranking gang member, such as Jackson in this situation, would not normally carry a weapon because he would have risen to the point where he did not have to take that risk anymore. And because of Jackson's influence and control over the others, there would have been repercussions if they had not gone along with Jackson. An autopsy revealed that Mays died as a result of a bullet that traveled through his upper thighs, severing his left femoral vein, before lodging in his upper left thigh. A GBI firearms examiner identified the bullet recovered from Mays's autopsy as a .40-caliber projectile.

Jackson testified in his own defense at trial. According to

Jackson, he was just trying to help Hollingshed find his gun. After Mays told him that J-Bone was not home and that he did not have the gun, Jackson thanked Mays and turned to leave. He then heard three to four gunshots and took cover behind a truck. He saw someone running down the street, shooting, and believed it was either Hardy, Flowers, or Rhodes. He wanted to call 911, but his cell phone battery had died. He admitted that he initially told responding officers that he did not see the shooters' faces and did not identify the other four men until he was interviewed later that night. He denied knowing that anyone had a gun, denied that they went to Mays's house with the intent to shoot him, and denied giving a signal to shoot Mays. Jackson admitted that he had been previously convicted of selling cocaine, criminal trespass, and obstruction of government property, and, on cross-examination, the State impeached Jackson's testimony that he had not previously been accused of shooting at anyone.

1. Jackson asserts that the trial court erred in failing to instruct the jury that an accomplice's testimony must be

8

corroborated.

Under Georgia law, "[t]he testimony of a single witness is generally sufficient to establish a fact." OCGA § 24-14-8. However, in "felony cases where the only witness is an accomplice, the testimony of a single witness shall not be sufficient." Id. Thus, when witnesses testify at trial who may be considered accomplices, corroborating evidence is required to support a guilty verdict. See *Edwards v. State*, 299 Ga. 20, 22 (1) (785 SE2d 869) (2016).

Here, the trial court charged the jury, in relevant part:

> The testimony of a single witness, if believed, is sufficient to establish a fact. Generally, there is no legal requirement of corroboration of a witness, provided you find the evidence to be sufficient.

The trial court did not charge the jury on the statutory corroboration requirement. Jackson concedes that because he neither requested an accomplice charge nor objected to the single-witness charge as given, we only review this claim for plain error. See OCGA § 17-8-58 (b) ("Failure to object in accordance with subsection (a) of this Code section shall preclude appellate review of such portion of the jury

9

charge, unless such portion of the jury charge constitutes plain error which affects substantial rights of the parties."); *Munn v. State*, 313 Ga. 716, 722 (3) (873 SE2d 166) (2022) ("Where a defendant does not request that the trial court give a jury instruction, . . . this Court only reviews for plain error.").

To establish plain error, Jackson must meet each of the following four prongs:

> First, there must be an error or defect — some sort of deviation from a legal rule — that has not been intentionally relinquished or abandoned, i.e., affirmatively waived. . . . Second, the legal error must be clear or obvious, rather than subject to reasonable dispute. Third, the error must have affected the appellant's substantial rights, which in the ordinary case means he must demonstrate that it affected the outcome of the trial proceedings. Fourth and finally, if the above three prongs are satisfied, the appellate court has the discretion to remedy the error — discretion which ought to be exercised only if the error seriously affects the fairness, integrity, or public reputation of judicial proceedings.

*Munn*, 313 Ga. at 722 (3) (citation and punctuation omitted).

It is well settled that "the failure to give an accomplice-corroboration charge [is] clear and obvious error where the trial

10

included purported accomplice testimony but the jury was instructed that facts could be established based on the testimony of a single witness." *Palencia v. State*, 313 Ga. 625, 628 (872 SE2d 681) (2022). See also *Stanbury v. State*, 299 Ga. 125, 129 (2) (786 SE2d 672) (2016) (holding that "the trial court's failure to provide a jury charge regarding accomplice corroboration was clear error not subject to reasonable dispute"). Thus, Jackson is able to meet the first two prongs of the plain error test.

However, Jackson's claim fails on the third prong of this test because any error did not likely affect the outcome of the proceeding, given that there was so much corroborating evidence presented at trial that the jury — if properly instructed — was unlikely to have returned a different verdict. See *Rice v. State*, 311 Ga. 620, 624 (1) (857 SE2d 230) (2021). To satisfy OCGA § 24-14-8 and support a guilty verdict, an accomplice's testimony at trial must be corroborated, and the amount of corroborating evidence need only be slight. See *Goodman v. State*, 313 Ga. 762, 767-68 (2) (a) (873 SE2d 150) (2022). Moreover, "[i]t is well settled that an accomplice's

testimony may be corroborated by the testimony of another accomplice." *Bedford v. State*, 311 Ga. 329, 332 (1) (857 SE2d 708) (2021) (citation and punctuation omitted).

Here, multiple witnesses, including Jackson, corroborated that Jackson participated in the crimes, and the State presented expert testimony that as an elder in the gang, Jackson would have had the authority to order others to commit the crimes. The testimony of McDonald, Flowers, and Hardy showed that Jackson directed the group to return to Jones's house and park in a nearby alley and that Jackson then took the lead in asking Mays about the gun. And both Flowers and Hardy testified that when Mays said that he did not have the gun, Jackson gave Rhodes a look that meant Rhodes should shoot Mays. Lieutenant Penson, an expert in gang crimes, explained that "[t]ypically . . . the elders or the older individual get somebody like a juvenile or a younger generation to do the criminal act for them, so, you know, they can all — they can have the deniability of being involved." Lieutenant Penson was familiar with Jackson and knew him to have a significant status

12

among the younger generation of gang members, including Rhodes and his co-indictees. In his expert opinion, because of Jackson's influence and control over the others, there would have been repercussions if they had not followed Jackson's instructions.

Moreover, Jackson testified at trial and admitted that he rode to Jones's house with Hardy, Flowers, Rhodes, and McDonald to retrieve Hollingshed's gun and that he was the one who confronted Mays about the gun. Although Jackson denied knowing that the other four men were armed and denied going to Jones's house with the intent to shoot anyone, the jury was free to disbelieve this testimony, particularly where Jackson admitted that he initially lied to the responding police officers and where the State impeached Jackson's testimony that he had not previously been accused of shooting at anyone. See *Howard v. State*, 308 Ga. 574, 576 (842 SE2d 12) (2020). The State also introduced evidence of Jackson's text message to J-Bone from which the jury could infer that Jackson was warning or threatening J-Bone's family regarding the return of the gun.

Thus, even if the jury had been given an accomplice-corroboration instruction, it likely would have determined that the testimony of any accomplice was sufficiently corroborated by either independent evidence or the testimony of another accomplice. See *Bedford*, 311 Ga. at 332 (1); *Montanez v. State*, 311 Ga. 843, 849 (1) (b) (860 SE2d 551) (2021) ("The necessary corroboration may consist entirely of circumstantial evidence, and evidence of the defendant's conduct before and after the crime was committed may give rise to an inference that he participated in the crime.") (citation and punctuation omitted). Accordingly, Jackson cannot show that the trial court's failure to give the accomplice-corroboration charge likely changed the outcome of the trial. See *Payne v. State*, 314 Ga. 322, 327 (1) (877 SE2d 202) (2022) ("Given the number of witnesses who implicated [Appellant] in the shooting, it is not likely that the jury convicted him based on the uncorroborated testimony of a single witness who was an accomplice."); *Rice*, 311 Ga. at 624 (1) (because the testimony of a co-defendant and another potential accomplice could be found mutually corroborating, trial court's clear error in not

14

giving an accomplice-corroboration charge likely did not change the outcome of the trial).

2. Jackson also asserts that the trial court abused its discretion by initially refusing to excuse Juror Number 22 for cause. We disagree.

Under Georgia law, the trial court has broad discretion to replace a juror with an alternate at any point during the proceedings where it is shown that the juror is unable to perform his or her duty or other legal cause exists. See OCGA § 15-12-172; *Morrell v. State*, 313 Ga. 247, 263 (3) (869 SE2d 447) (2022). "[T]he trial court's determination in matters such as this is based on the demeanor and credibility of the juror in question, which are peculiarly in the trial court's province." *State v. Arnold*, 280 Ga. 487, 490 n.2 (629 SE2d 807) (2006). We review a trial court's decision in this regard for an abuse of discretion. See *Cummings v. State*, 280 Ga. 831, 835 (6) (632 SE2d 152) (2006).

After the jury was empaneled, Juror Number 22 asked the bailiff why she had been selected when she had told the attorneys

that she knew the victim.[3] The following morning, the trial court questioned Juror Number 22 on the record, and she told the court that she had gone to school with Mays, explaining, "I don't think we ever had any classes together . . . but just like having little conversations with him." She responded that she did not know Mays "outside of school or anything like that." She also confirmed that she had honestly responded during voir dire that she could be fair and impartial in this case. When Jackson's counsel asked Juror Number 22 why she had "hesitated" when answering the trial court's question about being fair and impartial, she responded:

> Well, at first I said I didn't know, but he told me that he needed me to be . . . more specific on if I could do it or not, and I just told him that I could, it's just I know I'm an emotional person on anything, so it's just — that was just my issue, it's not basically as if I'm knowing him or I feel anybody's wrong, it's just seeing different stuff, it's just like — it just makes me emotional, because I remember when he was like that you will see like wounds and gun wounds and all that, like it just automatically

---

[3] Voir dire was not transcribed by a court reporter. However, it appears from other parts of the record that Juror Number 22 did disclose that she knew the victim. When the trial court announced Juror Number 22's later question to the bailiff, the prosecutor responded that he had asked the potential juror during voir dire if she could be fair and impartial, to which she had presumably responded yes.

makes me emotional about it.

The trial court denied Jackson's motion to remove her from the jury at that point, finding "there's been no bias that's been proved."

After the first day of trial, Juror Number 22 sent an e-mail to the trial court and the clerk, and the court spoke with her again on the record. Juror Number 22 explained that she had gone to school with many of the witnesses who had testified the first day, that she had dated Flowers's brother, and that she did not "feel safe having anything to do with this case." She responded that she did not feel she could remain impartial, given the circumstances. The trial court confirmed that Juror Number 22 had not talked about her concerns with any of the other jurors and then granted Jackson's motion to remove her as a juror; an alternate became the twelfth juror.

Jackson contends that the trial court erred by failing to remove Juror Number 22 for cause after his motion even though the record shows that Juror Number 22 was ultimately excused.[4] In a similar

---

[4] Jackson mistakenly states in his appellate brief that Juror Number 22 sat on the jury through the conclusion of the trial.

situation in which a trial court refused to remove a juror for cause and the defendant then exercised a peremptory strike on the challenged juror, we held that the defendant must show harm to prevail on his claim that the challenged juror should have been removed for cause. See *Willis v. State*, 304 Ga. 686, 702, 707 (11) (a) (820 SE2d 640) (2018) (overruling cases which had held that "causing a defendant to unnecessarily use a peremptory strike on a juror that should have been excused for cause is per se harmful error") (citation and punctuation omitted). In that context, we explained that harm resulting from the denial of a request to excuse a juror for cause is shown by demonstrating that one of the challenged jurors who served on the jury was unqualified. See id. at 707 (11) (a). Here, Jackson ultimately obtained the relief that he requested from the trial court — that the juror be excused for cause. Thus, Jackson cannot demonstrate any harm from the trial court's initial failure to excuse Juror Number 22, and his claim fails. See id.

*Judgment affirmed. All the Justices concur.*

Decided October 4, 2022.

Murder. Bibb Superior Court. Before Judge Simms.

*Shein Brandenburg & Schrope, Elizabeth A. Brandenburg*, for appellant.

*Anita R. Howard, District Attorney, Daniel P. Bibler, Assistant District Attorney; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Emily R. Polk, Assistant Attorney General*, for appellee.