318 Ga. 791
FINAL COPY

S24A0011. SAUDER v. THE STATE.

WARREN, Justice.

Appellant Frederick Sauder was convicted of malice murder and other crimes in connection with the armed robbery of Wayne Alexander on August 4, 2016, and his shooting death several days later, on August 9 or 10.[1] In this appeal, Sauder contends that the

---

[1] In December 2017, a White County grand jury indicted Sauder for the following counts related to the August 4 crimes: armed robbery, aggravated assault, burglary, two counts of possession of a firearm during the commission of a felony (based on aggravated assault and burglary), and possession of a firearm by a convicted felon. Sauder was also indicted for the following crimes related to the shooting on August 9 or 10: malice murder, two counts of felony murder (based on aggravated assault and burglary), aggravated assault, burglary, three counts of possession of a firearm during the commission of a felony (based on malice murder, aggravated assault, and burglary), and possession of a firearm by a convicted felon. The counts of possession of a firearm by a convicted felon were bifurcated. The remaining counts were tried before a jury from February 11 to 19, 2019, and the jury found Sauder guilty of those counts. The bifurcated counts were then nolle prossed. The trial court sentenced Sauder to serve life in prison for malice murder, 20 consecutive years for armed robbery, 20 concurrent years for burglary, and five consecutive years each for four of the counts of possession of a firearm during the commission of a felony (based on burglary on August 4 and malice murder, aggravated assault, and burglary on August 9 or 10). The remaining counts were vacated or merged. See *Dixon v. State*, 302 Ga. 691, 698 (808 SE2d 696) (2017). Sauder filed a timely motion for new trial, which he later amended four times through

evidence presented at his trial was legally insufficient to support several of his convictions. He also claims that the trial court abused its discretion by admitting into evidence an excerpt of a phone call he made while in jail awaiting trial, that the court committed several instructional errors, that the State failed to disclose evidence that two witnesses had "deals" in exchange for their testimony at trial, and that his trial counsel provided constitutionally ineffective assistance in several respects. Finally, he contends that the cumulative effect of these alleged errors and deficiencies entitles him to a new trial. As we explain below, we vacate Sauder's conviction for possession of a firearm during the commission of aggravated assault to correct a merger error, but we affirm his other convictions.

1. The evidence presented at Sauder's trial showed the following. In 2016, 66-year-old Alexander, who was in poor health

---

new counsel. After an evidentiary hearing, the trial court denied the motion in June 2023. Sauder filed a motion for reconsideration, which the trial court also denied. He then filed a timely notice of appeal, and the case was docketed to the term of this Court beginning in December 2023 and orally argued on January 10, 2024.

and had dementia, lived alone in a mobile home on his property in Cleveland, Georgia. Joshua Cunningham lived on a farm adjacent to Alexander's property with several members of his family and his girlfriend, Heather Holland. Cunningham and Holland often hung out and smoked methamphetamine with Sauder, Luke McClure, and McClure's wife—all of whom also stayed on the farm.

On August 4, 2016, Cunningham, Holland, Sauder, and his friend Justin Davis were at the farm when one of them "pointed out" Alexander's mobile home and mentioned that it was "abandoned." They walked to the home, peered in the windows, and eventually walked back to the farm. According to Davis, he and Sauder discussed going to the mobile home again later. That night, they returned to Alexander's property, carrying Sauder's shotgun and tools "in case [they] needed to break in." They smoked methamphetamine in Alexander's yard and then checked the doors to the mobile home, which were locked. They attempted to pry open a door, and Sauder kicked a sliding door several times before Alexander opened the door. They walked past Alexander, who said

3

nothing.[2] Sauder, who was holding his shotgun, told Alexander to sit down.

Sauder took Alexander's wallet, while Davis searched the home and gathered eight to ten guns, which he found in Alexander's closets, and a lockbox, which he found under Alexander's bed. Davis then took a power saw and some climbing gear from Alexander's outdoor shed; he loaded those items, the guns, and the lockbox into Sauder's car. At some point, Davis noticed that Alexander's arm was bleeding; he asked Sauder what happened, and Sauder said that Alexander "came at him." As Sauder and Davis tried to leave, Sauder's car got stuck in Alexander's muddy driveway. Sauder called Cunningham, and he and Holland soon arrived and towed Sauder's car out of the driveway. Sauder then dropped off Davis at his house. Davis kept two guns, the saw, and the climbing gear, and Sauder kept the remaining items. The next day, Sauder asked Davis

---

[2] Davis also testified that Alexander "didn't even really care" that Sauder and Davis came into the home; Alexander did not "try to resist or do anything" when they came in; and Davis "figured he was probably on painkillers or something. Just out of his mind . . . ."

if he wanted to return to Alexander's home, but Davis said, "No." Sauder told Davis that "he wanted to homestead the place," which Davis understood to mean that Sauder wanted to claim Alexander's property for himself. Sauder said that he knew some people who could "get rid of" Alexander.[3]

According to Cunningham, a few days later, on August 8, Sauder, who was a convicted felon and thus unable to purchase a gun, asked Cunningham to accompany him to a pawn shop to trade four guns that Sauder had for a new firearm. Cunningham agreed, and later that day, he and Sauder went to the pawn shop, and Cunningham traded four guns, three of which Alexander's wife

---

[3] Davis testified that he was charged with armed robbery, aggravated assault, burglary, two counts of possession of a firearm during the commission of a felony, and possession of a firearm by a convicted felon in connection with the August 4 crimes; pursuant to an agreement that he would testify at Sauder's trial, he pled guilty to armed robbery but had not yet been sentenced; the remaining charges, which could have added another 55 years in prison to his sentence, were dismissed; the maximum sentence for armed robbery was life in prison, but his plea agreement stated that his sentence would not exceed 20 years in prison; there was no agreement that the State would recommend less than 20 years; his sentencing would be "up to the judge at a sentencing hearing"; and he did not have any agreement with the State when he initially spoke to law enforcement officials on August 18, 2016, and gave a statement that was similar to his testimony at trial.

Melita Alexander ("Melita") identified at trial as belonging to Alexander, for a .22-caliber semiautomatic rifle.[4] Sauder carried the rifle out of the pawn shop, and he, Cunningham, and McClure later shot it on the farm for "target practice[ ]."[5]

The next day, August 9, Melita, who was separated from Alexander but still called him daily and kept many items at his home, spoke to Alexander on the phone around 3:30 p.m. She called him again around 9:30 p.m. When he did not answer, she called several more times throughout the night but received no response. Around 6:00 p.m. the next day, August 10, Melita and her boyfriend went to Alexander's home to check on him. They saw tire tracks in

---

[4] The owner of the pawn shop testified that he did not remember whether Sauder was with Cunningham during the transaction. However, a GBI agent who interviewed the owner on August 11, 2016, testified that the owner said that a man who matched Sauder's description was with Cunningham and that, when shown a photo of Sauder, the owner identified him as the man with Cunningham.

[5] Cunningham testified that he pled guilty to making a false statement, theft by receiving stolen property, and theft by deception in connection with the pawn shop transaction; the maximum sentence he could have received was 25 years in prison; in exchange for his testimony, he was sentenced as a first offender to five years' probation and a $1,500 fine; and when an investigator initially interviewed him before he was charged, he recounted a story similar to his testimony at trial.

the driveway, and they noticed that the door to Alexander's shed, which was normally locked, was ajar. When Melita went inside the mobile home, she saw near the door several of her musical instruments, which she typically kept in a closet. The home was "ransacked." Melita noticed jewelry boxes and several empty mason jars, in which Alexander typically kept coins, on the floor in the bedroom, and several drawers were open. Alexander, who was dead and "stiff," was slumped over on the couch with a jacket covering his head. Investigators who responded to Melita's 911 call found "pry marks" on one of the doors to the mobile home and a lock that had been cut off the outdoor shed. They collected four .22-caliber shell casings and two .22-caliber bullets from the scene.

According to Cunningham, Holland, and McClure, on August 10 (the day Alexander's body was found), Sauder was carrying around a large number of coins.[6] Holland and McClure's wife took the coins to a bank and converted them to $125 in cash, and

---

[6] Davis testified that neither he nor Sauder took a significant amount of coins from Alexander on August 4.

McClure's wife used the money to rent a motel room.

In addition, Davis testified that at some point, Sauder told him that he "watched" Alexander's "ex-wife shoot him"; Cunningham testified that Sauder told him at some point that he went inside Alexander's home and Alexander "was already dead"; and McClure testified that Sauder stated at various times that he went into Alexander's home, Alexander was "sick and wasn't doing too good," Alexander "passed away," and Sauder covered him with a blanket. McClure also testified that at various points, Sauder asked McClure to accompany him to Alexander's home (but McClure said "no"); Sauder had a "metal box" with paperwork in it and the guns that Melita identified as belonging to Alexander; Sauder asked McClure and other people who were hanging out with him if they had heard gunshots and said that he had just shot a bear; and Sauder asked McClure to cut his hair shortly after the murder.[7]

---

[7] Cunningham and Cunningham's mother similarly testified that Sauder mentioned that he shot a bear around the time of the murder and that his statement did not strike them as unusual because sometimes there were bears on their property. Cunningham also testified that Sauder got a haircut around

On August 11, the day after Alexander's body was found, an investigator interviewed Cunningham, who told him about trading the guns for the rifle at the pawn shop on Sauder's behalf and about later shooting the rifle at the farm. With Cunningham's permission, the investigator searched an area of the farm where Sauder often stayed and found sixteen .22-caliber shell casings on the ground and numerous partially burned documents that had Alexander's name on them in a burn barrel.

The next day, the investigator obtained a warrant for Sauder's arrest. On August 16, police officers located Sauder at a motel in Athens. After attempting to communicate with him for about four hours outside his motel room, officers deployed chemical munitions;

the time of the murder; McClure added that Sauder asked for a haircut because his hair was long, and McClure had been "giving him a hard time about how his hair looked." The prosecutor asked Melita, her boyfriend, Davis, Cunningham, and McClure whether they were involved in the shooting, and they each denied it.

In addition, McClure testified that he served six-and-a-half years in prison for voluntary manslaughter in connection with an unrelated crime; he was released in June 2014 (about two years before the shooting) and was on probation; he was not charged with any crimes related to Alexander's robbery and shooting; but as a result of his "involvement in this case" and "receipt of stolen property," his probation was revoked and he was sentenced to a nine-month-long, in-custody, substance abuse rehabilitation program.

Sauder finally left the room, and he was arrested. Investigators then searched the motel room and Sauder's car pursuant to a warrant and found several cards and documents that had Alexander's name on them and numerous items that Melita identified at trial as belonging to her or to Alexander. Under a mattress in the motel room, investigators found the .22-caliber semiautomatic rifle.

Investigators later searched a house in which Sauder rented a room around the time of the shooting. Behind the house, they found a trash bag that contained a name tag displaying Sauder's name and documents with Alexander's name on them. They found more documents showing Alexander's name in a burn barrel on the property. In addition, the owner of the property testified that he saw Sauder carrying the .22-caliber semiautomatic rifle.[8]

The medical examiner who performed Alexander's autopsy recovered three .22-caliber bullets from his body and concluded that he had been shot several times from an indeterminate range, which

---

[8] Cunningham's mother also testified that she saw Sauder carrying the .22-caliber rifle in the days surrounding the shooting.

caused his death, likely on August 9 or 10. A firearms examiner determined that all of the shell casings that were collected from Alexander's home and 15 of the 16 shell casings that were collected from Cunningham's farm were fired from the .22-caliber semiautomatic rifle.[9]

The State also presented a 40-second excerpt of a phone call Sauder made to his mother in August 2017, while he was in jail awaiting trial. During the call, Sauder said that "the other guy" was in jail. When his mother asked whether the "other guy" was "ready to point out" the person who shot Alexander, Sauder responded, "What do you mean? He wasn't there." He then said that it was "hard to explain," and he would "not do it over the phone." An investigator testified that Davis was in jail at the time of the call and that the investigator did not know whether McClure was in jail at that time.

Sauder did not testify at trial. His primary defense was that the State did not meet its burden of proving beyond a reasonable

[9] However, the examiner could not conclude whether the bullets found at Alexander's home, the bullets recovered from Alexander's body, or one of the shell casings found at the farm were fired from the rifle.

11

doubt that he killed Alexander.

2. (a) Sauder contends that the evidence presented at his trial was insufficient as a matter of constitutional due process to support his convictions for armed robbery on August 4, 2016, and malice murder and three counts of possession of a firearm during the commission of a felony on August 9 or 10, 2016.[10] This claim fails.

In evaluating the sufficiency of the evidence as a matter of constitutional due process, we view all of the evidence presented at trial in the light most favorable to the verdicts and consider whether any rational juror could have found the defendant guilty beyond a reasonable doubt of the crimes of which he was convicted. See *Jackson v. Virginia*, 443 U.S. 307, 319 (99 SCt 2781, 61 LE2d 560) (1979). "'We leave to the jury the resolution of conflicts or inconsistencies in the evidence, credibility of witnesses, and

---

[10] Sauder also contends that the evidence was insufficient to support the counts of aggravated assault on August 4, possession of a firearm during the commission of that crime, and felony murder, aggravated assault, and burglary on August 9 or 10. But he was not sentenced for those crimes, so his claim regarding them is moot. See, e.g., *Felts v. State*, 311 Ga. 547, 551 n.7 (858 SE2d 708) (2021).

reasonable inferences to be derived from the facts.'" *Henderson v. State*, 317 Ga. 66, 72 (891 SE2d 884) (2023) (citation omitted). A jury is authorized to find a defendant guilty beyond a reasonable doubt if the evidence shows either that he "[d]irectly commit[ted] the crime" or that he was a "party thereto." OCGA § 16-2-20. "Conviction as a party to a crime requires proof of a common criminal intent, which the jury may infer from the defendant's presence, companionship, and conduct with another perpetrator before, during, and after the crimes." *Rooks v. State*, 317 Ga. 743, 751 (893 SE2d 899) (2023) (citation and punctuation omitted). See also, e.g., *Howard v. State*, 318 Ga. 681, 684 (899 SE2d 669) (2024). "Mere presence at the crime scene, however, is insufficient to make someone a party to a crime." *Rooks*, 317 Ga. at 751 (citation and punctuation omitted).

Turning first to Sauder's claim about the August 4 armed robbery, the indictment charged him with armed robbery by using a firearm to take Alexander's guns. See OCGA § 16-8-41 (a) ("A person commits the offense of armed robbery when, with intent to commit

13

theft, he or she takes property of another from the person or the immediate presence of another by use of an offensive weapon . . . .”). Sauder argues that the State failed to prove that he “use[d]” a firearm to accomplish the theft because the evidence presented at trial showed that Alexander opened the door and sat quietly while Sauder and Davis stole his guns. But the element of “use of an offensive weapon” in OCGA § 16-8-41 (a) is satisfied by proof that the weapon was

> used as an instrument of actual or constructive force—
> that is, actual violence exerted on the victim or force
> exerted upon the victim by operating on the victim’s fears
> of injury to the person, property, or character of the victim
> such that the defendant’s acts created a reasonable
> apprehension on the part of the victim that an offensive
> weapon is being used.

*Green v. State*, 304 Ga. 385, 389 (818 SE2d 535) (2018) (citation and punctuation omitted). The evidence showing that Sauder held a shotgun and ordered Alexander to sit down while Davis collected Alexander’s guns authorized the jury to conclude that Sauder used a firearm to accomplish the theft of the guns. Thus, the evidence was constitutionally sufficient to support Sauder’s conviction as a party

14

to the crime of armed robbery. See *Jackson*, 443 U.S. at 319; OCGA § 16-2-20 (defining parties to a crime). See also *Green*, 304 Ga. at 389 (holding that evidence that the appellant "pulled out a gun and asked [the victim] what he had in his pockets" was sufficient to prove that the appellant used an offensive weapon within the meaning of OCGA § 16-8-41 (a)); *Bass v. State*, 356 Ga. App. 862, 867 (849 SE2d 718) (2020) (holding that evidence that the appellant "held [a] gun in his hand" while he took items from the victim was sufficient to support his armed robbery conviction).

As to the crimes on August 9 or 10, the evidence indicated that after Sauder and Davis stole guns from Alexander, Sauder mentioned "get[ting] rid of" Alexander; Sauder enlisted Cunningham to trade the stolen guns for a .22-caliber semiautomatic rifle—the gun used to shoot and kill Alexander days later; Sauder admitted that he returned to Alexander's home and was there at the time of the shooting; after the murder, Sauder was carrying coins and many other items that belonged to Alexander and Melita; and Sauder hid the rifle used in the shooting under a

mattress in his motel room. This evidence authorized the jury to find Sauder guilty at least as a party to the crimes of malice murder and possession of a firearm during the commission of a felony. See *Jackson*, 443 U.S. at 319; OCGA § 16-2-20. See also *Henderson*, 317 Ga. at 72 (holding that evidence that connected the appellant to the murder weapon and that he admitted he was at the scene of the shootings was constitutionally sufficient to support his malice murder convictions); *Blevins v. State*, 291 Ga. 814, 815-817 (733 SE2d 744) (2012) (concluding that evidence that the appellant was near the crime scene at the time of the murder and shortly thereafter tried to pawn items that belonged to the victim was constitutionally sufficient to support his conviction for malice murder).

(b) Sauder also claims that the evidence was insufficient as a matter of Georgia statutory law to support his convictions for the August 9 or 10 crimes discussed above—malice murder and three counts of possession of a firearm during the commission of a felony— because the circumstantial evidence failed to exclude the hypothesis

that Cunningham, McClure, or another one of Sauder's friends killed Alexander and that Sauder did not participate in the crimes. Under OCGA § 24-14-6, "[t]o warrant a conviction on circumstantial evidence, the proved facts shall not only be consistent with the hypothesis of guilt, but shall exclude every other reasonable hypothesis save that of the guilt of the accused." Whether an alternative hypothesis is reasonable "is usually a question for the jury, as this Court will not disturb the jury's finding unless it is insufficient as a matter of law." *Reyes v. State*, 309 Ga. 660, 664 (847 SE2d 194) (2020).

Assuming without deciding that the evidence related to the August 9 or 10 crimes was entirely circumstantial, the evidence recounted above was sufficient to authorize the jury to reject as unreasonable Sauder's alternative hypothesis. As discussed above, the State presented substantial evidence showing that Sauder participated in the shooting, including evidence that he said he wanted to "get rid" of Alexander, he stole numerous items from Alexander's home after the initial robbery with Davis, he was

present at the time of the shooting, and he possessed the murder weapon. Moreover, when the prosecutor asked Cunningham and McClure if they were involved in the shooting, they squarely denied it. But even if the jury believed that Cunningham, McClure, or another one of Sauder's friends shot Alexander, the jury could have reasonably concluded that Sauder shared with the shooter a common criminal intent to kill Alexander. Thus, the jury was authorized to reject the hypothesis that Sauder did not participate in the shooting and to instead find that he was guilty at least as a party to the crimes of malice murder and possession of a firearm during the commission of a felony. See, e.g., OCGA § 16-2-20; *Howard*, 318 Ga. at 684 (explaining that "a jury may infer a defendant's criminal intent, and thereby find him guilty as a party to a crime, 'from his presence, companionship, and conduct before, during, and after the offense'") (citation omitted). See also *Reyes*, 309 Ga. at 664-665 (concluding that evidence that the appellant had threatened to kill the victim and evidence connecting him to the murder weapon was sufficient under OCGA § 24-14-6 to support his

18

conviction for malice murder); *Blevins*, 291 Ga. at 815-817 (holding that evidence that the appellant was near the crime scene at the time of the murder and shortly thereafter tried to pawn items that belonged to the victim was sufficient under former OCGA § 24-4-6).[11]

3. Sauder claims next that the trial court abused its discretion by admitting into evidence the 40-second audio-recorded excerpt of the jail phone call—in which Sauder's mother asked if the "other guy" was ready to point out who shot Alexander and Sauder responded, "What do you mean? He wasn't there"—over his objection that the excerpt was not admissible under subsection (a) of OCGA § 24-4-408 ("Rule 408"). For the reasons explained below, we disagree.

Rule 408 (a) says:

> Except as provided in Code Section 9-11-68 [which relates to liability for attorney fees and litigation expenses when a party rejects a settlement offer in a tort case], evidence of:
>> (1) Furnishing, offering, or promising to furnish; or

---

[11] OCGA § 24-4-6, which was part of the old Evidence Code, was carried into the current Evidence Code in identical form in OCGA § 24-14-6, and there is no materially identical federal rule of evidence, so our case law interpreting the former provision is still applicable. See *Kimbro v. State*, 317 Ga. 442, 446 n.6 (893 SE2d 678) (2023).

(2) Accepting, offering, or promising to accept a valuable consideration in compromising or attempting to compromise a claim which was disputed as to either validity or amount shall not be admissible to prove liability for or invalidity of any claim or its amount.[12]

Sauder argues that the excerpt of the phone call should have been excluded under Rule 408 (a) because during other parts of the call (which were not admitted into evidence), Sauder made statements

---

[12] The remaining subsections of Rule 408 provide:
 (b) Evidence of conduct or statements made in compromise negotiations or mediation shall not be admissible.
 (c) This Code section shall not require the exclusion of any evidence otherwise discoverable merely because it is presented in the course of compromise negotiations or mediation. This Code section shall not require exclusion of evidence offered for another purpose, including, but not limited to, proving bias or prejudice of a witness, negating a contention of undue delay or abuse of process, or proving an effort to obstruct a criminal investigation or prosecution.
We note that Rule 408 (a) is materially identical to Federal Rule of Evidence 408 (a) (1), which says:
 (a) Prohibited Uses. Evidence of the following is not admissible—on behalf of any party—either to prove or disprove the validity or amount of a disputed claim or to impeach by a prior inconsistent statement or a contradiction:
  (1) furnishing, promising, or offering—or accepting, promising to accept, or offering to accept—a valuable consideration in compromising or attempting to compromise the claim[.]
We therefore look to federal appellate cases for guidance in interpreting the rule. See *State v. Almanza*, 304 Ga. 553, 556 (820 SE2d 1) (2018). See also Ronald L. Carlson & Michael Scott Carlson, Carlson on Evidence 182 (8th ed. 2023) (explaining that Georgia Rule 408 follows the federal rule).

that he claims constituted evidence of "an offer to compromise a disputed claim." Specifically, Sauder repeatedly asked his mother to call his lawyer and to reach out to the District Attorney to inform the lawyer and the District Attorney that Sauder was "willing to deal"; he was "ready to . . . tell [them] all [t]hat really happened"; and he would "pick the person that did it out of a lineup" based on "what [Sauder] saw." Asserting that these entreaties to his mother were an "offer to compromise" with the State, Sauder claims that the trial court abused its discretion by admitting his statement implying that he was present (and the "other guy" was not) when Alexander was shot, because that statement was part and parcel of such an offer.

Even assuming (without deciding) that Rule 408 (a) could apply to exclude a defendant's attempts "to compromise" with the State by negotiating a plea deal regarding charges in a criminal case, Sauder has not shown that the statements he made to his

21

mother fell within the ambit of the rule.[13] In particular, Sauder cites

no pertinent legal authority, and we have found none, to support his

assertion that any of the statements at issue here constituted an

---

[13] The United States Court of Appeals for the Eleventh Circuit has held that Federal Rule of Evidence 408 applies in both criminal and civil cases. See, e.g., *United States v. Arias*, 431 F3d 1327, 1336-1338 (11th Cir. 2005). See also *Almanza*, 304 Ga. at 559 (explaining that when a rule in our current Evidence Code is materially identical to a Federal Rule of Evidence and there are conflicts "'among the decisions of the various circuit courts of appeal in interpreting the federal rules of evidence,' the precedent of the Eleventh Circuit prevails") (quoting Ga. L. 2011, pp. 99, 100 § 1). But it appears that the Eleventh Circuit has not addressed whether Federal Rule of Evidence 408 could apply to exclude evidence of plea negotiations. See *United States v. King*, 623 Fed. Appx. 962, 965-966 (11th Cir. 2015) (addressing the admissibility of a USPS administrative complaint and cease and desist order under Federal Rule of Evidence 408 in a criminal case); *Arias*, 431 F3d at 1336-1338 (holding that a state administrative complaint was not admissible under Federal Rule of Evidence 408 in the appellant's criminal proceeding); *United States v. Pendergraft*, 297 F3d 1198, 1211 n.8 (11th Cir. 2002) (noting that a video of a civil settlement negotiation in which the appellants participated was admissible under Federal Rule of Evidence 408 in the appellants' criminal cases). See also Federal Practice and Procedure (Wright & Miller) § 5303 (2d ed. Feb. 2024 Update) (explaining that several federal circuit courts have held that Federal Rule of Evidence 408 bars "the use of evidence of civil compromise negotiations in a criminal prosecution," but whether the rule applies "to plea bargaining in a criminal case when the evidence of such plea bargaining is offered in a civil or a criminal case" is "more debatable").

We also note that OCGA § 24-4-410 (4) generally prohibits the State from introducing against a criminal defendant evidence of "[a]ny statement made in the course of plea discussions with an attorney for the prosecuting authority which does not result in a plea of guilty." Sauder does not claim that his statements to his mother should be excluded under that rule.

22

"offer" within the meaning of Rule 408 (a).[14] None of the statements in the excerpt of the recording that was played for the jury mentioned, or even implied, that Sauder wanted to negotiate a plea deal with the State. And even if we were to assume that these statements were made in connection with Sauder's asking his mother to contact his lawyer and the District Attorney to indicate that he was "willing" and "ready" to make a deal, that request was not an "offer" under Rule 408 (a) either; at best, Sauder's request implored his mother (who had no authority to negotiate a plea deal on his behalf) to initiate contact with the lawyers involved in his case to ask them to begin discussions that he hoped might lead to his receiving an offer from the State for a negotiated plea. Simply put, Sauder's asking his mother to ask the State to provide a plea deal did not constitute an offer to compromise within the meaning

---

[14] Sauder relies primarily on *Nevitt v. CMD Realty Investment Fund IV, L.P.*, 282 Ga. App. 533, 535-538 (639 SE2d 336) (2006). But that case interpreted former OCGA § 24-3-37, which was part of our old Evidence Code and said, in pertinent part, "admissions or propositions made with a view to a compromise are not proper evidence." Because that provision is not part of our current Evidence Code, *Nevitt* is not applicable. See *Almanza*, 304 Ga. at 556.

of Rule 408 (a).

Under these circumstances, we cannot say that the trial court abused its discretion by concluding that the statements at issue did not need to be excluded under that rule. See *United States v. Castillo*, 615 F2d 878, 885 (9th Cir. 1980) (holding that an appellant's statement to a prison counselor "that he would probably 'cop' to a charge of manslaughter" was not excludable under Federal Rule of Evidence 408 because the appellant could not have negotiated a plea deal with the counselor, who had no such authority). See also *United States v. Fernandez*, 559 F3d 303, 318 (5th Cir. 2009) (noting that Federal Rule of Evidence 408 "would appear to bar" evidence of a proffer letter for the appellant's immunity from prosecution but that his "preceding conversation" with law enforcement agents and "perhaps even his offer to 'help out'" by providing the agents more information "would remain admissible").[15]

---

[15] As mentioned above, although Rule 408 (a) excludes evidence of certain offers and acceptances, Rule 408 (b) more broadly mandates the

4. Sauder contends that the trial court erred when, while instructing the jury about the State's burden of proof, the court declined to give the pattern jury instruction on "grave suspicion," which says, "Facts and circumstances that merely place upon the defendant a grave suspicion of the crime charged or that merely raise a speculation or conjecture of the defendant's guilt are not sufficient to authorize a conviction of the defendant." Georgia Suggested Pattern Jury Instructions, Vol. II: Criminal Cases § 1.20.20. This claim fails.

"In evaluating a claim that the trial court was required to give certain jury instructions, we view the charge as a whole to determine whether the jury was fully and fairly instructed." *Clark v. State*, 315 Ga. 423, 440 (883 SE2d 317) (2023) (citation and punctuation

---

exclusion of "evidence of . . . *statements* made in compromise negotiations." (Emphasis added.) See *Equal Employment Opportunity Comm. v. UMB Bank Financial Corp.*, 558 F3d 784, 791 (8th Cir. 2009) (noting that several federal courts of appeal have held that Federal Rule of Evidence 408 (a) (2), which excludes "conduct or a statement made during compromise negotiations about the claim," may apply to "certain work product, internal memos, and other materials created specifically for the purpose of conciliation, even if not communicated to the other party" and collecting cases). But Sauder does not argue that Rule 408 (b) applies here, so we do not address it.

omitted). Here, the trial court thoroughly instructed the jury on the presumption of innocence, the State's burden to prove beyond a reasonable doubt each essential element of the charged crimes, criminal intent, and parties to a crime. Those instructions fully informed the jury that it was not authorized to find Sauder guilty as a party to the crimes if the evidence presented at trial merely raised "a grave suspicion" or "a speculation or conjecture" of his guilt. Georgia Suggested Pattern Jury Instructions, Vol. II: Criminal Cases § 1.20.20. And in any event, given the evidence presented at trial and detailed above, the substantial evidence against Sauder raised more than a grave suspicion of his guilt, at least as a party to the crimes. Accordingly, the trial court did not err by refusing to instruct the jury on grave suspicion. See *Welch v. State*, 309 Ga. 875, 879 (848 SE2d 846) (2020) (holding that the trial court did not err by failing to instruct the jury on grave suspicion, because the court "'gave complete instructions on reasonable doubt and presumption of innocence'" and "'(t)he trial evidence raised more than a bare suspicion of [the appellant's] guilt'") (citations omitted); *Jenkins v.*

26

*State*, 281 Ga. 24, 25 (635 SE2d 714) (2006) (same). See also *Clark*, 315 Ga. at 440-441 (concluding that the trial court's omission of an instruction on grave suspicion was not a clear and obvious error under plain-error review, because the court instructed on the presumption of innocence, reasonable doubt, criminal intent, and parties to a crime, which fully informed the jury that it was not authorized to find the appellant guilty as a party to the crimes unless he shared his co-defendant's criminal intent to shoot the victim).

5. Sauder argues that the trial court committed plain error by failing to provide jury instructions on circumstantial evidence, mere presence and knowledge, and the law requiring corroboration of an accomplice's testimony. As Sauder acknowledges, his trial counsel did not object to the alleged omission of these instructions, so we review these claims for plain error only. See OCGA § 17-8-58 (b); *Clark*, 315 Ga. at 440. To establish plain error, Sauder must show that the alleged instructional error "was not affirmatively waived; was clear and obvious, rather than subject to reasonable dispute;

likely affected the outcome of the trial; and seriously affected the fairness, integrity, or public reputation of judicial proceedings." Id. (citation and punctuation omitted). "An appellant must establish all four elements of the test in order to demonstrate plain error, so satisfying this test is difficult, as it should be." Id. (citation and punctuation omitted). We address each of Sauder's claims in turn.

(a) With respect to circumstantial evidence, Sauder argues that the trial court failed to instruct the jury on OCGA § 24-14-6, which as discussed above in relation to Sauder's statutory sufficiency claim, says, "To warrant a conviction on circumstantial evidence, the proved facts shall not only be consistent with the hypothesis of guilt, but shall exclude every other reasonable hypothesis save that of the guilt of the accused." But the trial court gave the pattern jury instruction on direct and circumstantial evidence, which says, among other things, that the jury "would be authorized to convict only if the evidence[,] whether direct, circumstantial, or both[,] excludes all reasonable theories of innocence and proves the guilt of the [defendant] beyond a reasonable doubt." Georgia Suggested

28

Pattern Jury Instructions, Vol. II: Criminal Cases § 1.30.20. That instruction conveyed the substance of OCGA § 24-14-6. Thus, the trial court did not err, much less clearly and obviously so, in this respect. See *Eubanks v. State*, 317 Ga. 563, 580 (894 SE2d 27) (2023) (holding that the trial court did not err by giving the pattern jury instruction on circumstantial evidence rather than instructing that the "State had to disprove any theory of innocence supported by the evidence," because the pattern instruction "effectively conveyed" that point) (emphasis omitted). See also *Hassan v. State*, 318 Ga. 673, 678-680 (899 SE2d 693) (2024) (rejecting the appellant's argument that a jury instruction, which was similar to the one given in this case, failed to advise the jury of OCGA § 24-14-6 and holding that the instruction was not a clear and obvious error).[16]

---

[16] Sauder also argues that the trial court incorrectly instructed that the jury "should not be concerned about whether the evidence is direct or circumstantial" and that "[t]here is no legal difference in the weight [the jury] may give to either direct or circumstantial evidence," in accordance with the pattern jury instruction on direct and circumstantial evidence. See Georgia Suggested Pattern Jury Instructions, Vol. II: Criminal Cases § 1.30.20. But he cites no authority to support that argument, so he has not carried his burden of showing that the court clearly and obviously erred by giving those instructions. See *Hassan*, 318 Ga. at 679-680 (rejecting the appellant's claim

(b) Sauder asserts that the trial court's failure to instruct the jury on mere presence and knowledge was plain error. However, as discussed above in relation to Sauder's claim that the court erred by failing to instruct the jury on grave suspicion, the court thoroughly instructed on the presumption of innocence, the State's burden to prove beyond a reasonable doubt each essential element of the charged crimes, criminal intent, and parties to a crime. These instructions adequately informed the jury that it was not authorized to find Sauder guilty if he was merely present at the scene of the crime or if he did not knowingly and intentionally participate in the crimes. Thus, when evaluated in the context of the jury charge as a whole, the trial court's failure to expressly instruct on mere presence and knowledge was not a clear and obvious error beyond reasonable dispute. See, e.g., *Clark*, 315 Ga. at 441 (holding that the trial court did not clearly and obviously err by failing to instruct the jury on mere presence and knowledge, because the court instructed on the

_____

that the trial court committed plain error by giving similar jury instructions, because he cited no controlling authority for the proposition that the instructions were erroneous).

30

presumption of innocence, the State's burden of proof, criminal intent, and parties to a crime).

(c) Asserting that Cunningham and McClure were accomplices to the August 9 or 10 crimes, Sauder contends that the trial court committed plain error by instructing the jury that the testimony of a single witness, if believed, was sufficient to establish a fact without also instructing that, with respect to those crimes, accomplice testimony must be corroborated.[17] See OCGA § 24-14-8; *Doyle v. State*, 307 Ga. 609, 612-613 (837 SE2d 833) (2020) (explaining that an accomplice-corroboration instruction is required when there is slight evidence supporting a finding that a witness was an accomplice and that a trial court's failure to give such an instruction, while giving a single-witness instruction, in a case where the defendant was directly linked to the crimes through an accomplice's testimony, generally constitutes a clear and obvious error under plain-error review). Assuming without deciding that Sauder did not

---

[17] The trial court gave an accomplice-corroboration instruction with respect to the August 4 crimes.

31

affirmatively waive this argument and that there was slight evidence that Cunningham and McClure were accomplices such that the failure to give an accomplice-corroboration instruction regarding the August 9 or 10 crimes was a clear and obvious error, Sauder has not established that any such error likely affected the jury's guilty verdicts.

Even if an accomplice-corroboration instruction had been given, the jury likely would have concluded that Cunningham's and McClure's testimony about the August 9 or 10 crimes was sufficiently corroborated, because the State presented a substantial amount of corroborating evidence. In this respect, evidence that corroborates an accomplice's testimony

> may be circumstantial and it may be slight, and it need not of itself be sufficient to warrant a conviction of the crime charged. It must, however, be independent of the accomplice's testimony and either directly connect the defendant with the crime or justify an inference that he is guilty. In addition, the independent evidence must corroborate both the identity of the defendant and the fact of his participation in the crime. In other words, corroboration of only the chronology and details of the crimes is not sufficient, and there must be some independent evidence tending to show that the defendant

himself was a participant in the crimes. *Crawford v. State*, 294 Ga. 898, 900-901 (757 SE2d 102) (2014) (citations and punctuation omitted). Moreover, "'(i)t is well settled that an accomplice's testimony may be corroborated by the testimony of another accomplice.'" *Jackson v. State*, 314 Ga. 751, 755 (879 SE2d 410) (2022) (citation omitted).

Here, Cunningham's testimony about obtaining the .22-caliber semiautomatic rifle—the murder weapon—for Sauder at the pawn shop was corroborated by statements from other witnesses, including the pawn shop owner's statement to the GBI agent that Sauder was with Cunningham when Cunningham obtained the gun; testimony from Cunningham's mother and the owner of the property where Sauder rented a room that Sauder was carrying the rifle in the days leading up to the murder; and evidence that investigators found the rifle in Sauder's motel room when he was arrested. McClure's testimony that, at some point, Sauder asked McClure to accompany him to Alexander's home was corroborated by Davis's similar testimony that Sauder "wanted to homestead the place" and

33

had asked Davis if he wanted to return to the home after the August 4 robbery. Cunningham and McClure both testified that Sauder was carrying a significant number of coins on the day Alexander's body was found, that Sauder indicated that he had gone inside Alexander's home and had seen his dead body, and that he had mentioned that he shot a bear around the time of the murder—thus corroborating each other's accounts on those points.[18] Moreover, the State introduced independent evidence corroborating Cunningham's and McClure's testimony. Specifically, Holland testified about Sauder's carrying a large amount of coins; Davis testified that Sauder said he "watched" Alexander's "ex-wife shoot him," implying that Sauder was present at the time of the shooting (although he inexplicably pointed to Melita as the shooter), and Sauder indicated during the jail phone call that he was present when Alexander was

---

[18] We note that Cunningham and McClure also corroborated each other's testimony that Sauder got a haircut around the time of the murder. And in any event, the evidence that Sauder got a haircut near the time of the murder likely had little impact on the jury's guilty verdicts, given that McClure testified that Sauder needed a haircut and that the State presented other, more probative evidence to show that Sauder tried to evade law enforcement officials after the crimes, including evidence that Sauder fled to a motel in Athens shortly after the murder and refused to leave when investigators attempted to arrest him.

shot; and Cunningham's mother testified about Sauder's saying he shot a bear.

In sum, given the ample evidence corroborating Cunningham's and McClure's testimony about the August 9 or 10 crimes, Sauder has not shown a reasonable probability that the outcome of his trial would have been different had the jury been instructed under OCGA § 24-14-8 that an accomplice's testimony must be corroborated. He has therefore failed to establish plain error. See, e.g., *Jackson*, 314 Ga. at 755-756 (holding that the appellant could not establish that the trial court's failure to give an accomplice-corroboration instruction likely affected the outcome of his trial under the third part of the plain-error test, because multiple witnesses corroborated that the appellant participated in the crimes); *Lewis v. State*, 311 Ga. 650, 665-666 (859 SE2d 1) (2021) (concluding that the trial court's failure to give an accomplice-corroboration instruction with respect to certain counts in the indictment likely did not affect the outcome of the appellant's trial under plain-error review, because "the State introduced a substantial amount of evidence that

corroborated [the alleged accomplice's] testimony as to those counts"). Compare *Doyle*, 307 Ga. at 612-614 (holding that the trial court plainly erred by failing to instruct the jury on accomplice corroboration where the accomplice's testimony "was the bedrock on which [the appellant's] convictions rest").

6. Sauder claims that the State violated his right to due process under *Brady v. Maryland*, 373 U.S. 83 (83 SCt 1194, 10 LE2d 215) (1963), by failing fully to disclose that Davis and McClure had "deals" in exchange for their testimony. Specifically, Sauder argues that although Davis testified at trial that his guilty plea agreement stated that in exchange for his testimony, the State would recommend that his sentence for armed robbery not exceed 20 years in prison and there was no agreement that the State would recommend a sentence of less than 20 years, one of the prosecutors made a deal with Davis's plea counsel agreeing to recommend that Davis be sentenced to only ten years in prison. Sauder also asserts that the State made a deal with McClure that in exchange for his testimony, the State would not charge him for crimes related to this

case and would recommend lenient treatment in an unrelated probation-revocation matter. As explained below, we conclude that the trial court did not err by denying Sauder's motion for new trial on this ground. See, e.g., *Hood v. State*, 311 Ga. 855, 863 (860 SE2d 432) (2021) (explaining that a trial court's factual findings regarding a *Brady* claim are reviewed under a clearly erroneous standard, while the court's application of the law to the facts is reviewed de novo).

It is well established that:

"The suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U. S. at 87. This includes the suppression of impeachment evidence that may be used to challenge the credibility of a witness. See *Giglio v. United States*, 405 U. S. 150, 154-155 (92 SCt 763, 31 LE2d 104) (1972). Accordingly, the State is obligated to reveal any agreement, even an informal one, with a witness regarding criminal charges pending against the witness. To prevail on a *Brady* claim, a defendant must show that the State possessed evidence favorable to the defendant; the defendant did not possess the evidence nor could he obtain it himself with any reasonable diligence; the prosecution suppressed the favorable evidence; and had the evidence been disclosed to the defense, a

> reasonable probability exists that the outcome of the
> proceeding would have been different.

*Hood*, 311 Ga. at 863 (cleaned up). A reasonable probability of a different result, also known as the materiality requirement, is established when the State's suppression of evidence "'undermines confidence in the outcome of the trial.'" Id. at 864 (citation omitted). "In this analysis, we review the record de novo and weigh the evidence as we would expect reasonable jurors to have done, rather than viewing all the evidence in the light most favorable to the verdicts." *State v. Thomas*, 311 Ga. 407, 417 (858 SE2d 52) (2021). So viewed, even assuming that Sauder could establish the first three elements of his *Brady* claim, he has not met the materiality requirement, because he has not shown a reasonable probability that the outcome of his trial would have been different if the State had disclosed information about Davis's and McClure's alleged deals. See *Kyles v. Whitley*, 514 U.S. 419, 436 (115 SCt 1555, 131 LE2d 490) (1995) (explaining that *Brady* materiality is defined "in terms of suppressed evidence considered collectively, not item by item").

Turning first to Sauder's assertion that the State failed to disclose an alleged agreement with Davis for a recommendation of a ten-year prison sentence, we note that Davis testified that pursuant to his deal with the State, he pled guilty to armed robbery—a crime for which the maximum sentence is life in prison—with a sentence that would not exceed 20 years; the State dismissed other charges that could have added 55 years to his sentence; and the ultimate sentencing decision would be "up to the judge at the sentencing hearing." Thus, although the jury was not informed of Davis's alleged deal for a ten-year sentence, it was nonetheless aware that he had a significant incentive to cooperate with the State by testifying against Sauder. See *Hood*, 311 Ga. at 861-864 (holding that the appellant failed to prove the materiality prong of the *Brady* test and explaining that although the State allegedly failed to disclose that a witness had a deal for a sentence of 25 months and three years of supervised release as well as the dismissal of several felony charges, the jury was informed that he faced a sentence of 85 to 105 months and that his plea agreement said the State would

consider his cooperation in determining whether to recommend a reduced sentence, so the jury was "aware that there was reason to regard his testimony with skepticism"); *Rhodes v. State*, 299 Ga. 367, 369-370 (788 SE2d 359) (2016) (holding that there was no reasonable probability that the alleged failure to disclose the terms and extent of deals with two witnesses affected the outcome of the appellant's trial, because the jury was aware of their motivations to testify to gain favor with the State).

Moreover, Davis testified, and Sauder does not dispute, that he had no agreement with the State whatsoever when he gave a statement to law enforcement officials about a week after the murder in August 2016—nearly two-and-a-half years before Sauder's trial and more than three years before the date of Davis's sentencing in August 2019—that was consistent with his testimony at trial. See *Harris v. State*, 309 Ga. 599, 606-607 (847 SE2d 563) (2020) (holding that the appellant failed to establish a reasonable probability that the outcome of his trial would have been different if the State had disclosed information about a witness's alleged deal,

because the evidence at trial showed that the witness provided a statement to the police that was consistent with his testimony months before the alleged date on which the witness received a reduced sentence in exchange for his cooperation, and he testified that he was hoping to receive a reduced sentence due to his cooperation). For these reasons, the alleged evidence that Davis had a deal for a ten-year prison sentence (rather than a deal for a sentence that would not exceed 20 years) likely would not have had a significant impact on the jury's assessment of his credibility. See *Hood*, 311 Ga. at 865-866; *Harris*, 309 Ga. at 606-607.

We now turn to the alleged deal between the State and McClure. Evidence that McClure had an agreement with the State that he would not be charged in this case and that he would receive more favorable treatment in the probation matter likely would have had some effect on the jury's appraisal of his credibility, particularly because (unlike with Davis) the jury was not aware that McClure had any express incentive to testify against Sauder. But even if the jury had discredited and thus discounted McClure's testimony, it

would have had little effect on the jury's view of the evidence at trial as a whole, because his testimony was largely cumulative of other evidence. See *Hood*, 311 Ga. at 865 (holding that there was not a reasonable probability that the outcome of the appellant's trial would have been different if the State had disclosed evidence of a witness's alleged deal for a reduced sentence, because the witness's testimony was cumulative of other evidence at trial). See also *Sullivan v. Lockhart*, 958 F2d 823, 825-826 (8th Cir. 1992) (concluding that the appellant had not proven that it was reasonably probable that evidence of a witness's alleged deal would have affected the outcome of his trial, because the witness's testimony was cumulative of other evidence). Specifically, McClure's testimony about Sauder's carrying a large number of coins near the time of the murder was cumulative of Holland's similar account. McClure's testimony that Sauder had returned to Alexander's home after the August 4 robbery and had seen his dead body was largely cumulative of Davis's testimony to that effect, and Sauder himself indicated during the jail phone call that he was present at the time

42

of the shooting. McClure's testimony that Sauder had a metal box with paperwork in it and had the guns that Melita identified as belonging to Alexander was cumulative of Davis's testimony that he and Sauder stole a lockbox and guns from Alexander, and McClure's testimony that Sauder said he shot a bear was cumulative of Cunningham's mother's testimony on that point.

We acknowledge that some of McClure's testimony—about Sauder's carrying coins, returning to Alexander's home and seeing his body, and shooting a bear—was also cumulative of Cunningham's testimony, and thus corroborated Cunningham's account on those points. That corroboration matters in light of Sauder's claim, discussed in Division 5 (c), that McClure and Cunningham were both accomplices, and that the trial court plainly erred by failing to instruct the jury that an accomplice's testimony is not sufficient to establish a fact unless it is corroborated. That is: if Cunningham's testimony had to be corroborated because he was an accomplice, and the only corroboration came from McClure, then evidence that McClure had a deal with the State that would

undermine his credibility could qualify as material evidence under *Brady*. See *Thomas*, 311 Ga. at 417-419 (concluding that the appellant established the materiality prong of the *Brady* test, because the State failed to disclose a deal with a witness whose testimony "'could be viewed as the most significant piece of corroborating evidence offered by the State in a case where the corroborating evidence was both slight and wholly circumstantial'"). But that was not the case here because, as we discussed above, other independent evidence corroborated each material aspect of Cunningham's story.[19] Thus, even if the jury had been informed of McClure's alleged deal with the State and determined that it rendered his testimony not credible, Cunningham's testimony was amply corroborated. In sum, McClure's testimony, while helpful to the State, was not a crucial component of the strong evidence against Sauder. Compare id.

---

[19] We note that Cunningham's statement that Sauder got a haircut around the time of the murder was corroborated only by McClure's testimony on that point. But as we discussed above, that statement likely had little effect on the jury's guilty verdicts.

Thus, weighing the evidence as we would expect reasonable jurors to have done, we conclude that Sauder has not established a reasonable probability that the evidence of Davis's and McClure's alleged deals with the State would have affected the jury's guilty verdicts. Accordingly, this claim fails. See *Hood*, 311 Ga. at 865-866; *Harris*, 309 Ga. at 606-607.

7. Sauder contends that his trial counsel provided constitutionally ineffective assistance in several respects. To prevail on these claims, Sauder must establish that counsel's performance was constitutionally deficient and that he suffered prejudice as a result. See *Strickland v. Washington*, 466 U.S. 668, 687-695 (104 SCt 2052, 80 LE2d 674) (1984); *Smith v. State*, 308 Ga. 81, 87 (839 SE2d 630) (2020). To prove deficient performance, Sauder must show that his trial counsel "'performed at trial in an objectively unreasonable way considering all the circumstances and in the light of prevailing professional norms,'" which requires that Sauder overcome the "'strong presumption' that trial counsel's performance was adequate." *Smith*, 308 Ga. at 87 (citations omitted). To prove

45

prejudice, Sauder must establish a reasonable probability that, but for counsel's deficient performance, the result of the trial would have been different. See *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. We need not address both parts of the *Strickland* test if Sauder makes an insufficient showing on one. See *Smith*, 308 Ga. at 87.

(a) Sauder argues that his trial counsel was ineffective for failing to present evidence that he claims showed that Cunningham, McClure, or someone else could have killed Alexander. Specifically, at the hearing on his motion for new trial, Sauder introduced GBI reports noting the following: McClure's wife told investigators that at some point, Sauder and McClure walked away from the farm and returned a couple of hours later with coins and "antique 'knickknacks,'" McClure admitted to her that he went with Sauder to Alexander's property but said he did not go inside the home, and an unidentified man told her that he went to Alexander's home with Sauder and saw Alexander's dead body; Cunningham initially told

investigators that the .22-caliber semiautomatic rifle (the murder weapon) belonged to him; McClure's phone communicated with Cunningham's phone several times and was near the farm and Alexander's home on the night of August 9; investigators considered McClure a suspect and had evidence that he was a gang member; McClure warned his wife not to speak to investigators without a lawyer; Cunningham threatened Holland after she spoke with investigators, accusing her of "trying to get him locked up"; and DNA testing on a hammer found near Alexander's body contained DNA profiles from Alexander and an unidentified person, and Sauder, Davis, Cunningham, and McClure were excluded as contributors.

Sauder has failed to establish that counsel's decision not to present any of this evidence was so unreasonable that no competent lawyer would have made it under the circumstances. To begin, some of the evidence Sauder points to—including the evidence that Sauder and McClure had coins and "knickknacks," that McClure admitted he accompanied Sauder to Alexander's home, and that an unidentified man also went with Sauder to the home and saw

47

Alexander's body—would have suggested to the jury that Sauder was guilty, at least as a party to the crimes. Counsel was not deficient for deciding not to introduce this potentially inculpatory evidence. See, e.g., *Smith*, 308 Ga. at 91-92 n.10 (explaining that trial counsel's strategy to avoid the introduction of potentially inculpatory evidence was reasonable and rejecting the appellant's ineffective assistance claim).

As for the evidence Sauder claims would have indicated that Cunningham or McClure committed the crimes, counsel testified at the motion for new trial hearing that his theory of defense was that the State had not established who killed Alexander or shown "beyond a reasonable doubt that it was . . . Sauder" and that he did not want to "point[ ] the finger" at any other particular person, because that would "run[ ] the risk of the jury saying no, we're pretty convinced that person didn't have anything to do with it." Counsel also testified that he believed there was not enough evidence for him to be able to blame someone else, and that it was better to argue that the State had not proved beyond a reasonable doubt that Sauder was

48

a principal or a party to the crimes, which was a "not uncommon strategy of [ ] defense, depending on the quality of the evidence." In support of that defense theory, trial counsel asserted during his closing argument that the "big hole" in the State's case was that no one knew what happened when Alexander was murdered; there were inconsistencies in the State's evidence; and the State had not sufficiently explained how certain evidence proved Sauder's guilt. Counsel's decision to argue that the State failed to prove beyond a reasonable doubt that Sauder participated in the killing—rather than presenting specific evidence that might have suggested that Cunningham or McClure participated in the crimes but would not have suggested that Sauder was not also a participant—was objectively reasonable given the circumstances. See *Kidwell v. State*, 264 Ga. 427, 432 (444 SE2d 789) (1994) (holding that the appellant's trial counsel was not deficient for failing to investigate evidence of other crimes committed by his co-indictees, because his defense theory was that the appellant was not involved in the charged crimes and had no knowledge of any other crimes). See also *Lee v.*

49

*State*, 318 Ga. 412, 423 (897 SE2d 856) (2024) ("'An attorney's decision about which defense to present is a question of trial strategy, and trial strategy, if reasonable, does not constitute ineffective assistance of counsel.'") (citation omitted).

Finally, counsel's decision not to introduce evidence showing that the hammer contained DNA profiles from Alexander and an unidentified person was not unreasonable, particularly because there was no evidence connecting the hammer to Alexander's shooting death. Evidence that an unidentified person may have come into contact with a hammer in Alexander's home at some unknown point would not have raised a reasonable inference of Sauder's innocence and would not have directly connected the unidentified person to the crimes. See *Payne v. State*, 314 Ga. 322, 333 (877 SE2d 202) (2022) (explaining that "'[t]his Court has followed the general rule that, before testimony can be introduced that another person committed the charged crime, the proffered evidence must raise a reasonable inference of the defendant's innocence and, in the absence of a showing that the other person

50

recently committed a crime of the same or a similar nature, must directly connect the other person with the corpus delicti,'" and holding that trial counsel did not perform deficiently by failing to present evidence that another person's DNA was found on a beer bottle at the crime scene, because the evidence that the person may have been at the crime scene at some unknown point did not raise a reasonable inference of the appellant's innocence) (citation omitted).

Because Sauder has not shown that his trial counsel performed deficiently by deciding not to introduce the evidence detailed above, he cannot establish that counsel was ineffective in this respect.

(b) Sauder claims that his trial counsel was ineffective for failing to "take basic steps necessary to reveal the deal between the State and [McClure]." But as discussed above in relation to Sauder's *Brady* claim, he has not established a reasonable probability that the outcome of his trial would have been different if the State had disclosed information about an alleged deal with McClure. Thus, even if his trial counsel performed deficiently by failing to obtain evidence about a deal, Sauder cannot prove prejudice under

*Strickland*. See, e.g., *Harris*, 309 Ga. at 607 (holding that because the appellant could not establish the materiality element of his *Brady* claim, he also could not prove prejudice for his related ineffective assistance of counsel claim); *Thomas*, 311 Ga. at 417 (explaining that *Brady*'s materiality requirement mirrors the test for determining prejudice in an ineffective assistance claim).

(c) Sauder contends that his trial counsel provided ineffective assistance by failing to cross-examine McClure about the fact that although he was sentenced for voluntary manslaughter in an unrelated case, he had been charged with malice murder in that case. It appears that Sauder argues that counsel should have questioned McClure about the malice-murder charge in an effort to elicit testimony that would contradict his earlier testimony about the circumstances underlying his conviction, the seriousness of which Sauder claims was "minimized." Sauder points to McClure's testimony on direct examination that in the other case, he was "slap-boxing" with the victim; they then engaged in "an actual fist fight"; McClure's wife tried to intervene and the victim slapped her; the

victim pulled out a knife and stabbed McClure three times; and McClure stabbed him once, killing him.

We conclude that evidence that McClure was initially charged with malice murder in that case would have had little, if any, probative value to contradict his testimony about the facts related to the knife fight or to disprove his claim that he was acting in self-defense. See, e.g., *Olds v. State*, 299 Ga. 65, 75 (786 SE2d 633) (2016) (explaining that "the greater the tendency to make the existence of a fact more or less probable, the greater the probative value"). Nor would evidence of the malice-murder charge have been probative to show McClure's bias in testifying for the State. McClure was indicted for malice murder in the other case in 2008 and agreed to plead guilty to voluntary manslaughter in 2009—more than seven years before the crimes at issue in this case occurred and nearly ten years before Sauder's trial—so the malice-murder charge was no longer pending and had been resolved for several years when McClure testified in this case. Moreover, McClure testified about his conviction for voluntary manslaughter and that he was still serving

a probated sentence for that crime—and we have already addressed Sauder's claim that McClure made a deal with the State for lenient treatment in his probation-revocation matter.

Accordingly, we cannot say that trial counsel performed deficiently by not asking McClure about the malice-murder charge in the other case, because it was not probative to contradict his testimony about the underlying facts of the crime in that case or to show his bias in testifying. See, e.g., *Moore v. State*, 315 Ga. 263, 269 (882 SE2d 227) (2022) (explaining that "[t]he scope of an attorney's cross-examination is 'grounded in trial tactics and strategy, and will rarely constitute ineffective assistance of counsel,'" and holding that trial counsel did not perform deficiently by failing to cross-examine witnesses about the sentences they faced on charges that were pending at the time of trial, because the evidence showed that the witnesses had not received any benefit as to those charges in exchange for their testimony) (citation omitted).

(d) Sauder claims that trial counsel was ineffective for failing to request jury instructions on circumstantial evidence, mere

54

presence, and knowledge. As discussed above with respect to Sauder's claims that the trial court plainly erred by allegedly omitting these instructions, the court properly instructed the jury on the substance of OCGA § 24-14-6 (the circumstantial evidence statute), and other instructions in the jury charge adequately covered the concepts of mere presence and knowledge. Thus, counsel did not perform deficiently in this regard. See, e.g., *Kimbro v. State*, 317 Ga. 442, 456 (893 SE2d 678) (2023) (concluding that trial counsel was not deficient for failing to object to the omission of a jury instruction on mere presence, because the trial court instructed the jury on the presumption of innocence, the State's burden to prove beyond a reasonable doubt each essential element of the charged crimes, circumstantial evidence, and criminal intent); *Downey v. State*, 298 Ga. 568, 574 (783 SE2d 622) (2016) (holding that trial counsel did not perform deficiently by failing to object to the omission of a jury instruction on knowledge, because other instructions sufficiently covered that concept); *Pruitt v. State*, 282 Ga. 30, 34 (644 SE2d 837) (2007) (explaining that trial counsel's

failure to object to jury instructions that were "correct statements of the law" was not deficient performance).[20]

(e) Sauder argues that trial counsel was ineffective for failing to request an accomplice-corroboration instruction as to the August 9 or 10 crimes. Even assuming that counsel performed deficiently, Sauder cannot establish prejudice for the same reasons discussed above with respect to his related plain-error claim. See *Payne*, 314 Ga. at 329 (explaining that "'(t)his Court has equated the prejudice step of the plain error standard with the prejudice prong for an ineffective assistance of counsel claim'") (citation omitted).

---

[20] Sauder also briefly asserts that trial counsel was ineffective for failing to expressly mention to the jury the concepts of circumstantial evidence, mere presence, and knowledge with respect to the August 9 or 10 crimes, and that counsel should have pursued a defense of mere presence as to those crimes. But trial counsel essentially pointed to the circumstantial nature of the evidence as to the August 9 or 10 crimes during his closing argument and repeatedly asserted that the State failed to prove Sauder's guilt beyond a reasonable doubt, which was not a patently unreasonable strategy under the circumstances. Thus, Sauder cannot prove that his counsel performed deficiently in this way, either. See *Davenport v. State*, 283 Ga. 171, 175 (656 SE2d 844) (2008) (explaining that defense counsel "is given wide latitude in making closing arguments" and that trial counsel is not ineffective "simply because another attorney might have used different language or placed a different emphasis on the evidence") (citation and punctuation omitted). See also *Lee*, 318 Ga. at 425.

(f) Sauder claims that his trial counsel was ineffective for failing to object or move for a mistrial when the prosecutor made statements that, he claims, misled the jury about the law of parties to a crime. We disagree.

By way of background, the State's theory of the case at trial was that Sauder shot Alexander, but the prosecutor also argued in closing that even if the evidence indicated that Sauder and "a buddy" perpetrated the shooting, the jury would be authorized to find Sauder guilty as a party to the crimes. The prosecutor said, among other things, that party-to-a-crime liability "means if you were intentionally helping in a crime, then you're part of the whole thing"; that Sauder admitted that he "was present" when Alexander was shot; and that Sauder may have "provided" the murder weapon to the shooter. Sauder now argues that these statements improperly implied that the jury would be authorized to find him guilty as a party to all of the charged crimes even if he committed only some of them and even if he was merely present at the crime scene.

The prosecutor's statements, taken in context, did not

misrepresent the law. Under OCGA § 16-2-20 (b) (3), a person is a party to a crime if he "[i]ntentionally aids or abets in the commission of the crime." The prosecutor's explanation that a person is a party if he was "intentionally helping in a crime" essentially conveyed that point. And a reasonable juror likely would have understood the prosecutor's following reference to being "part of the whole thing" as an assertion that someone who intentionally helps commit a crime is part of that particular crime, because immediately before and after that statement, the prosecutor's arguments focused only on party-to-a-crime liability regarding the murder.

In addition, by mentioning Sauder's presence at the crime scene and his potentially providing the murder weapon to the shooter, the prosecutor pointed to reasonable inferences from the evidence supporting Sauder's involvement in the murder. Indeed, the prosecutor also argued that the evidence showed that the .22-caliber semiautomatic rifle was the murder weapon, that Sauder purchased it, and that he had it with him in the days surrounding the shooting. See, e.g., *Howard*, 318 Ga. at 684 (explaining that "a

jury may infer a defendant's criminal intent, and thereby find him guilty as a party to a crime, 'from his presence, companionship, and conduct before, during, and after the offense'") (citation omitted). The prosecutor did not argue that the jury would be authorized to find that Sauder was a party to the crimes even if he lacked the requisite criminal intent to commit them. Moreover, the prosecutor told the jurors that the trial court would instruct them on the law of parties to a crime, and during the final charge, the trial court accurately instructed on that legal concept and criminal intent. The court also advised the jury that the lawyers' closing arguments were not evidence.

Because the prosecutor's statements, viewed in the context of his argument as a whole, were not improper, Sauder's trial counsel did not perform deficiently by not objecting to them or moving for a mistrial on that basis. See *Faulkner v. State*, 295 Ga. 321, 326-327 (758 SE2d 817) (2014) (holding that trial counsel was not deficient for failing to object to the prosecutor's statement that the jury could find the appellant guilty as a party to the crimes "because he aided

or abetted the commission of those crimes when he helped the shooter move [the victim], rob him, and get away," as that statement was not legally improper, and noting that even if an objection might have had some merit, a reasonable lawyer could have decided to rely on the trial court's charge on parties to a crime, rather than make an objection of questionable merit). See also *Lee v. State*, 317 Ga. 880, 887 (896 SE2d 524) (2023) (explaining that this Court considers closing arguments in context; prosecutors are granted "'wide latitude'" in closing argument and may "'argue reasonable inferences from the evidence'"; and "'(w)hether to object to a particular part of a prosecutor's closing argument is a tactical decision, and counsel's decision not to make an objection must be patently unreasonable to rise to the level of deficient performance'") (citations omitted).[21]

---

[21] Sauder also baldly asserts in his brief that his trial counsel was ineffective because he "failed to make the adversarial testing process work at trial," failed "to formulate or articulate a theory of defense," failed "to make an effective opening statement," failed "to cross-examine the State's witnesses effectively," failed "to point out weaknesses in the State's evidence," failed "to present available evidence which would have raised doubt concerning

8. Sauder contends that the combined prejudicial effect of the errors and deficiencies he alleges entitles him to a new trial. See *State v. Lane*, 308 Ga. 10, 17 (838 SE2d 808) (2020). As discussed above, we have assumed (without deciding) that the trial court committed a clear and obvious error by failing to give an accomplice-corroboration instruction as to the August 9 or 10 crimes; that counsel performed deficiently by failing to request such an instruction; that the State suppressed evidence of deals with Davis and McClure; and that counsel was deficient for failing to discover

---

[Sauder's] guilt," failed "to object to inadmissible evidence offered by the State," failed "to object to improper statements made by the [prosecutor] in closing argument," failed "to request jury instructions to support the theory of defense obviously presented by the evidence," failed to object "to incorrect or incomplete jury instructions," failed "to articulate the obvious defense presented by the evidence (mere presence at the scene of a crime)," and failed "to make an effective closing argument." To the extent Sauder has not identified specific instances of these alleged deficiencies, he has not carried his burden of showing that his lawyer performed deficiently. See, e.g., *Wallace v. State*, 296 Ga. 388, 392 (768 SE2d 480) (2015) (holding that the appellant had not shown that his trial counsel performed deficiently by failing to file a motion to suppress identification evidence, because he did not specify which witnesses gave objectionable testimony or why it was inadmissible and explaining that "'[i]t is not this Court's job to cull the record on behalf of the (appellant) to find alleged errors'") (citation omitted). And in any event, Sauder makes no specific argument and cites no authority to support any of these claims, so we do not address them. See former Supreme Court Rule 22; *Sinkfield v. State*, 318 Ga. 531, 547 n.11 (899 SE2d 103) (2024).

McClure's deal. Even assuming that the alleged instructional error and alleged suppression under *Brady* are the sorts of errors that could be assessed cumulatively—an issue we need not decide here— Sauder has not established a reasonable probability that these assumed defects and deficiencies, taken together, affected the outcome of his trial.

As we have explained, an accomplice-corroboration instruction probably would not have altered the jury's verdicts as to the crimes on August 9 or 10, because Cunningham's and McClure's testimony was amply corroborated by other, independent evidence. The jury learned that Davis had a substantial deal with the State and that he had given investigators a statement that was consistent with his testimony long before any deal had arisen, so additional evidence about the deal likely would not have swayed the jury. And although evidence of an alleged deal between the State and McClure may have helped Sauder discredit McClure, his testimony was cumulative of other evidence and thus was not critical to prove Sauder's guilt or to corroborate Cunningham's account of the August

9 or 10 crimes. In sum, it is not reasonably probable that the minimal prejudice from these assumed defects and deficiencies, even if viewed together, affected the outcome of Sauder's trial, particularly in light of the other significant evidence of his guilt. See, e.g., *Hood*, 311 Ga. at 867-868 (assuming without deciding that the alleged suppression of a deal between a witness and the State under *Brady* and the trial court's alleged clear error in failing to give a confession-corroboration instruction should be assessed together under *Lane* and concluding that the appellant had not established cumulative prejudice, "[g]iven the quantum and strength of the evidence, independent of [the witness's] testimony and corroborative of any single confession [the appellant] made").

9. Finally, although Sauder does not raise the issue, we have noticed a merger error with respect to his sentencing. The jury found Sauder guilty of two counts of possession of a firearm during the commission of a felony (based on aggravated assault and burglary) on August 4, and three counts of possession of a firearm during the commission of a felony (based on malice murder, aggravated assault,

and burglary) on August 9 or 10. The trial court sentenced him to serve five consecutive years in prison each for four of the firearm-possession counts (based on burglary on August 4 and malice murder, aggravated assault, and burglary on August 9 or 10) and merged the firearm-possession count based on aggravated assault on August 4. The court erred by sentencing Sauder on the firearm-possession count based on aggravated assault on August 9 or 10.

Under OCGA § 16-11-106 (b) (1) and (2), a person commits the crime of possession of a firearm during the commission of a felony if he has "on or within arm's reach of his . . . person a firearm . . . during the commission of" certain felonies, including "[a]ny crime against or involving the person of another" or "[t]he unlawful entry into a building or vehicle." And as to sentencing, we have explained that

> where multiple crimes are committed together during the course of one continuous crime spree, a defendant may be convicted once for possession of a firearm during the commission of a crime as to every individual victim of the crime spree, as provided under OCGA § 16-11-106 (b) (1), and additionally once for firearm possession for every crime enumerated in [paragraphs] (b) (2) through (5).

64

*State v. Marlowe*, 277 Ga. 383, 386 (589 SE2d 69) (2003). As to the crime spree on August 9 or 10, the trial court should have sentenced Sauder for only one of the firearm-possession counts related to Alexander (as well as the count related to burglary), so the court erred by failing to merge the firearm-possession count based on aggravated assault into Sauder's conviction for firearm-possession based on malice murder. We therefore vacate Sauder's conviction and sentence for possession of a firearm during the commission of the felony of aggravated assault. See, e.g., *Welch*, 309 Ga. at 880-881 (vacating the appellant's conviction and sentence for possession of a firearm during the commission of the felony of aggravated assault of the victim, because it should have merged into his conviction for firearm-possession based on the malice murder of the victim).[22]

---

[22] We note that the trial court also erred by merging the firearm-possession count based on aggravated assault on August 4. But that error benefited Sauder; the State has not raised it by cross-appeal; and we see no exceptional circumstances that would warrant the exercise of our discretion to correct it. See *Dixon*, 302 Ga. at 696-698 (explaining that even when no party raises a merger error, we have discretion to correct it on direct appeal, but when the error benefits the defendant and the State fails to raise it by cross-appeal, we exercise our discretion to correct the error only in exceptional circumstances).

*Judgment affirmed in part and vacated in part. All the Justices concur.*



Decided April 30, 2024.

Murder. White Superior Court. Before Judge Matthews, Senior Judge.

*Wade M. Crumbley*, for appellant.

*W. Jeffrey Langley, District Attorney, Gregory A. Futch, Assistant District Attorney; Christopher M. Carr, Attorney General, Beth A. Burton, Deputy Attorney General, Meghan H. Hill, Clint C. Malcolm, Senior Assistant Attorneys General, Faith D. Worley, Stephany J. Luttrell, Assistant Attorneys General*, for appellee.